[Civ. No. 2205. Fourth Appellate District.—November 9, 1938.]

J. E. MORROW et al., Appellants, v. COAST LAND COMPANY (a Corporation) et al., Respondents.

Theodore M. Stuart and M. C. Gallaher for Appellants.

Wm. M. Cannon, McCutchen, Olney, Mannon & Greene, Edwin S. Pillsbury, A. L. Weil, Martin J. Weil, Michael F. Shannon and Thomas A. Wood for Respondents.

MARKS, J.—This is an action to establish and recover a one-half interest in 480 acres of oil land in the North Dome of the Kettleman Hills oil district in Kings County, California. Judgments went for defendants and plaintiffs have appealed.

The several parties each present numerous separate arguments in support of their respective positions, either supporting or attacking the validity of the judgments. To seriously consider any considerable number of them would stretch the length of this opinion beyond all reason and could serve no useful purpose in reaching a decision of the case.

The trial court found that the contract which forms the basis of plaintiffs' claim was abandoned by the mutual consent of the parties to it; that the plaintiffs were guilty of laches that defeated their recovery; that their cause of action was barred by the statute of limitations. It is clear that if any one of these findings is supported by the evidence, the judgments must be affirmed. We will, therefore, confine ourselves to a consideration of these findings and will disregard all of the other numerous questions presented by counsel.

Early in January, 1909, a group of citizens located three quarter sections of section 22, township 22 south, range 18 east, M. D. B. & M., in Kings County, as placer mining claims "for the purpose of developing petroleum, gypsum and other minerals". The assessment work for 1909 was done. The locators associated with themselves another group of citizens. We will refer to the combined groups, composed

of twenty-three persons, as the "Morrow Group". They built roads, two small houses and erected an oil derrick. No machinery was placed in it and no drilling was done on any of the quarter sections.

By an executive order, dated September 27, 1909, President Taft withdrew from location large bodies of land in California and Wyoming, including the lands claimed by the Morrow group. This order contained the following:

"In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry or disposal under the mineral or non-mineral public land laws. All locations or claims existing or valid on this date may proceed to entry in the usual manner after filing, investigation and examination."

On June 25, 1910, Congress passed what is known as the Pickett Act, which contained the following:

"Provided, That the rights of any person who, at the date of any order of withdrawal, is a *bona fide* occupant or claimant of oil or gas bearing lands and who, at such date, is in the diligent prosecution of work leading to the discovery of oil or gas, shall not be affected or impaired by such order so long as such occupant or claimant shall continue in diligent prosecution of said work; . . . " (43 U. S. C. A. 108, sec. 142.)

In 1910, some of the members of the Morrow group and W. H. Ochsner entered into negotiations with a view of prospecting for oil on the mineral claims. These negotiations culminated in a contract bearing date of July 30, 1910, signed by the members of the Morrow group and Ochsner. The last acknowledgment in point of time bears the date of September 14, 1910. This contract was not recorded until November 29, 1930, more than twenty years after its execution.

The contract provided that the members of the Morrow group were the owners of the three mining claims, the three quarter sections, in Kings County; that they would permit Ochsner to enter upon the property to do the necessary work and development to obtain a patent, or patents, from the United States of America, to be applied for in the names of the members of the Morrow group, but at

the expense of Ochsner; that Ochsner, at his own cost, should immediately construct drilling rigs and other structures on two of the quarter sections, do all necessary work to protect the possession of the land and prepare and record proofs of labor; that Ochsner would, within twelve months, actually start the drilling of an oil well on one of the quarter sections and proceed with drilling operations until a depth of 4,000 feet had been reached, unless oil in commercial quantities had been discovered at a lesser depth; that after the first well had been completed Ochsner would drill like wells on each of the other two quarter sections. The contract further provided that as soon as a commercial well had been completed on one quarter section, Ochsner, at his own cost, would obtain a patent to the land in the name of the Morrow group members and would likewise obtain patents to the other quarter sections under like circumstances. It was further provided that as soon as patents were obtained the members of the Morrow group would convey to Ochsner one-half of each quarter section which he would himself select and which would include the oil well drilled by him. A deed to Ochsner was to be placed in escrow after his written notice of the location of each well to be drilled. (No such notice was given and no deeds executed.) Pending the issuance of patents Ochsner was to have the possession and use of each half of each quarter section. At any time after Ochsner had erected the derricks and other necessary structures he was given the right, on written notice, to abandon the contract and to surrender to the members of the Morrow group possession of the land, and title to all structures, machinery, equipment and other property in or on it. The contract was prepared by Frank H. Short, a member of the Morrow group, and a prominent and successful attorney of Fresno, California, who had had much experience in handling oil leases and litigation involving oil rights and oil bearing properties.

Previous to his contract with the Morrow group and on January 22, 1910, Ochsner entered into a contract with W. P. Dunham whereby Ochsner agreed to search for prospective oil-bearing lands and Dunham agreed to pay him a compensation of $400 per month, and in addition, to give him a three per cent interest in any discoveries. Ochsner recommended lands in the Kettleman Hills district for ex-

ploration. Dunham organized an association which was subsequently incorporated under the laws of the state of Arizona as the Medallion Oil Company. It had a paid up capital stock of $100,000 and was authorized to do business in California. Ochsner secured drilling rights on property other than that of the Morrow group in the same neighborhood. These locations, with those of the Morrow group, composed the properties on which the Medallion Oil Company proposed to operate and hoped to develop oil. Ochsner was the only one connected with the Medallion Oil Company who had any knowledge of his contract with the members of the Morrow group. The members of the Morrow group had no knowledge of his contract with Dunham.

In October of 1910, Ochsner, for his principal, the Medallion Oil Company, and at the expense of this company, commenced drilling a well on the northeast quarter of section twenty, township 22 south, range 18 east, M. D. B. & M. in Kings County, which was about a mile distant from the locations of the Morrow group. Drilling operations were continued to a depth of something over 4,000 feet without discovering either oil or gas. Mechanical difficulties developed which resulted in the loss of the hole below about 3,300 feet. The well was abandoned at about the end of 1912 and thereafter everything was removed.

The Medallion well was evidently looked upon as a prospect hole for the benefit of the Morrow group locations. On August 7, 1911, Ochsner secured from the members of the Morrow group an extension of the time in which to start his operations under his contract with them. This extension was given by the following letter:

"Dear Mr. Ochsner:

"Yours of the 5th recd. contents duly noted. Mr. Snodgrass and Morrow have referred their letters to me; in reply will say, I have discussed this matter with many of the parties concerned, and they agree with me to give you reasonable extension of time while you are progressing with developing work; of course this will in no way change the original contract, hoping that you will soon strike paying oil or gas, I remain

"Yours very truly,
"(Signed) W. S. HOPKINS."

It is contended by plaintiffs that during 1912, a second extension was verbally granted Ochsner, giving him an indefinite period in which to perform under his contract. The evidence of this extension was, to say the least, extremely sketchy, and the trial court made no finding on the question. For the purposes of this opinion we will assume that such extension was granted.

As far as we are able to determine no communication passed between Ochsner and any member of the Morrow group concerning the three mining locations after 1912 or perhaps early in 1913. The buildings and derrick were either removed or fell into decay so that by 1923 there was no sign of any development work ever having been performed on them. Nothing was done concerning these claims by any member of the Morrow group until April 25, 1929. In fact, no one made any effort to start or to prosecute any drilling operations in the entire Kettleman Hills district for a number of years after January 1, 1913.

After the withdrawal order of President Taft in 1909, much difference of opinion arose concerning the legal effect of the order and of the Pickett Act. These questions were finally submitted to the Supreme Court of the United States in the case of *United States* v. *Midwest Oil Co.*, 236 U. S. 459 [35 Sup. Ct. 309, 59 L. Ed. 673], where, in an opinion delivered on February 23, 1915, the withdrawal order was upheld. Mr. Frank H. Short, a member of the Morrow group, appeared in that case as one of the *amici curiae*.

Prior to 1920, Ochsner and others interested themselves in efforts to get Congress to pass legislation which would permit private individuals to develop those oil reserves which had been withdrawn from location. During this period Ochsner wrote several letters, principally to Dunham, expressing his intention to protect the interests of his associates in the Medallion Oil Company drilling project. Appellants have cited us to no letter on this subject addressed to any member of the Morrow group. Respondents confidently assert that no such letter was ever written. We have found no such letter in the record nor can there be found any identification of one in any of the briefs or their supplements. As appellants have failed to incorporate a copy of any such letter, or reference thereto, in their briefs or supplements, and as the exhibits are not reproduced in the

transcript so that reference may be made thereto, we are justified in concluding that no written communication passed between Ochsner and any member of the Morrow group for about fifteen years prior to the date of his death in 1927.

On February 25, 1920, Congress passed the Leasing and Prospecting Act. (30 U. S. C. A. 381, sec. 181 et seq.) We will refer to this statute as the Leasing Act. This act provided for issuing prospecting permits and the leasing of oil and other lands of the United States. Generally speaking, leases on a royalty basis were to be issued by the government to those discovering oil or gas under prospecting permits.

After some false starts, Ochsner, in November, 1920, filed an application under the Leasing Act for a permit to prospect for oil on 2,538.24 acres of land in or near the North Dome of the Kettleman Hills district. (See *Dougherty* v. *California Kettleman Oil Royalties, Inc.,* 9 Cal. (2d) 58 [69 Pac. (2d) 155].) This included the three placer mining locations made by the Morrow group in 1909. The application contained the following:

"That Washington H. Ochsner and associates drilled a well known as the 'Medallion' well on Section Twenty-two (22) of the lands hereinbefore applied for and appends hereto a log of said well, together with a statement of expense, believing that in the discretion of the Honorable Commissioner at the General Land Office, the above fact should warrant his consideration as against other claims or applications for said lands." (This reference to section 22 was an error as the Medallion well was drilled on section 20.)

Under date of April 16, 1921, Ochsner was granted a permit of two years' duration in which to prospect for oil or gas on this land. This permit placed the following obligations, among others, on him:

"2. Within six months from date hereof to install upon some portion of the lands a substantial and adequate drilling outfit and to commence actual drilling operations.

"3. Within one year from date hereof to drill one or more wells, not less than 6 inches in diameter, to a depth of at least 500 feet each, unless valuable deposits of oil or gas shall be sooner discovered.

"4. Within two years from date hereof to drill one or more wells to a depth of at least 2000 feet, unless valuable deposits of oil or gas shall be sooner discovered."

As Ochsner could not fulfill the quoted requirements of the permit within the six months time limit, he asked for and received extensions of his time to perform. On August 17, 1923, Ochsner, for a valuable consideration of an overriding royalty, transferred all of his right, title and interest in the permit to the Coast Land Company. This assignment was approved by the secretary of the interior. It was recorded in King's County on October 16, 1924.

On October 8, 1923, the Coast Land Company, in consideration of $5,000 in cash, and $100,000 out of oil, if produced, transferred all of its right, title and interest in the permit to the General Petroleum Corporation. This assignment was approved by the secretary of the interior on November 1, 1923. On June 11, 1926, the General Petroleum Corporation, for a valuable consideration, assigned all of its right, title and interest in the permit to the General Petroleum Corporation of California. This assignment was approved by the secretary of the interior on August 11, 1926.

In and after November, 1920, and for many years prior thereto, and up to July 23, 1930, there was no evidence that anyone, other than the United States, was in possession of or claimed any interest in section 22, township 22 south, range 18 east, M. D. B. & M. in Kings County, except under the permit and assignments we have enumerated.

On December 31, 1923, the General Petroleum Corporation commenced operations on the permit land preparatory to drilling a well to explore for oil. On January 30, 1924, actual drilling was started. This well reached a depth of 6,434 feet without discovering oil or gas in commercially paying quantities and was abandoned on March 17, 1926. On April 16, 1927, the General Petroleum Corporation of California commenced the drilling of a second well on the permit property. Oil and gas in commercially paying quantities were discovered on April 2, 1929, but drilling operations were continued and the well was completed on January 8, 1930. Its production was large.

On March 5, 1929, a third well was started on the permit land by the General Petroleum Corporation of California. It was completed and put in operation on June 14, 1930.

The trial court found, on proper evidence, that the General Petroleum Corporation and the General Petroleum Corporation of California had expended in excess of $1,700,000 in drilling these three wells. The General Petroleum Corporation of California received a gross income of about $14,000,000 from the permit property up to the time of trial. Its expenses in connection therewith were about $9,000,000.

On July 23, 1930, the United States of America issued to the General Petroleum Corporation of California a lease on 640 acres of the permit land which contained one of the quarter sections of section 22, half of which is claimed by appellants. This lease required the lessee to pay to the United States a rental of $1 per acre per year and a royalty of five per cent of all oil and gas produced, saved and sold therefrom. On January 9, 1931, the United States of America issued to the General Petroleum Corporation of California a lease to 1,898.24 acres of the permit land which contained the other two quarter sections of section 22 in which appellants claim an interest. This lease provided for a like cash rental and a royalty scaling up from twelve and one-half per cent, depending on the amount of production.

Ochsner died in 1927 and his estate went into probate. No claim against his estate was filed by any member of the Morrow group nor by any of their successors.

In 1928 an oil well known as the ''Milham Well'' was completed and brought into production on the North Dome of the Kettleman Hills. This was the first completion in that district. It was a large producer of gas and high gravity oil. It caused great interest among oil producers and those having property or any interest in property in or near the Kettleman Hills.

Under date of April 25, 1929, a member of the Morrow group wrote the following letter:

''A. L. Weil, S. F.

''Dear Sir:

''I am informed that you are atty. for the Ochsner estate, will you please let me know what condition the estate is in as Mr. Ochsner and I are interested in 320 acres of land in the Kettleman hills near the two big gushers.''

Mr. Weil replied as follows:

"Responding to your letter of April 25th: I am not the attorney for the Ochsner Estate, and do not know anything about its condition."

The letter of April 25, 1929, was the first sign of motion or interest on the part of any member of the Morrow group since the derrick, casing, machinery, tools and equipment of the Medallion well were moved in 1913. After April 25, 1929, they did start an investigation which culminated in the filing of the complaint in this action on March 14, 1931.

Prior to January 5, 1930, eleven members of the Morrow group had died and probate proceedings were had on their estates. It was stipulated that in no inventory filed in any of the probate proceedings was there listed any claim to any property in the Kettleman Hills. Probate proceedings in the estate of Ewen Cameron, one of the Morrow group, commenced in 1931, showed an interest claimed in the oil property in question here.

In 1933 the Medallion Oil Company had been revived. It filed an action in the United States District Court, Southern District of California, to establish its interest in the Ochsner permit property, including the three quarter sections in section 22 involved here. Many of the defendants in that action are defendants here. The plaintiffs in the instant action appeared as defendants in the federal court action and by appropriate pleadings set up the identical claim to the interest in the three quarter sections that they are asserting here.

After an extended trial, and upon much the same evidence that we have before us, the United States District Court held against both the Medallion Oil Company and the defendants, who are plaintiffs here, and in favor of the other defendants in that action who are defendants here. The plaintiffs in the instant action (defendants in that action) did not appeal from the judgment against them and it has become final. The Medallion Oil Company appealed to the Ninth Circuit Court of Appeals and the judgment against it was affirmed on August 30, 1937. (*Medallion Oil Co.* v. *Hilda Carling Hinckley*, 92 Fed. (2d) 155.) While there is not an identity of parties in the two actions, there was similarity of issues and evidence. The decisions of the federal courts are entitled to great respect here because the

issues that are decisive of this appeal were decided there upon similar pleadings and evidence. For that reason we will quote from both of the opinions in the following portions of this opinion.

Abandonment of the Morrow group-Ochsner contract of 1910 by all parties thereto, was found by the trial judge. Under familiar rules of law, if there is any substantial evidence or reasonable inferences to be drawn from such evidence supporting the conclusion of the trial court, this finding cannot be disturbed here.

We have already set forth in considerable detail the facts of the case bearing on abandonment of the contract of 1910. Without repeating those facts, we may summarize, as follows, our reasons for the conclusion that the finding of abandonment is supported by the evidence: Cessation of work on the Medallion well in 1912; removal of all drilling equipment from all drilling enterprises in the entire district; complete abandonment of all development operations in the entire Kettleman Hills district; failure of Ochsner and members of the Morrow group to file proofs of labor or in any other manner to protect the location notices; failure of any member of the Morrow group to request that Ochsner perform under his contract; the decision of the case of *United States* v. *Midwest Oil Co., supra,* in 1915, upholding the withdrawal order of 1909; knowledge that the placer mining locations were of dubious value, especially unless diligently protected by actual development work; failure to have performed any development work to protect the locations; passing of the Leasing Act in 1920; failure of any member of the Morrow group to take any steps or to have Ochsner take any steps to secure prospecting permits under the Leasing Act; Ochsner's applying for a permit in his own name and not in the names of, or for, the members of Morrow group in 1920; the issuing of the permit to Ochsner in 1921 in his name and not in the names of, or for, the members of Morrow group, extensions of permit in the name of Ochsner; assignment of permit by Ochsner to Coast Land Company; recordation of this assignment and other documents showing Ochsner was claiming for himself alone; assignment by Coast Land Company to General Petroleum Corporation; assignment by General Petroleum Corporation to General Petroleum Corporation of

California; approval of these assignments by the secretary of the interior; starting drilling operations on permit land in 1923 and prosecuting them until oil was discovered on April 2, 1929; failure of any· member of the Morrow group to assert any claim to or interest in any part of the permit land until after oil was discovered in the Kettleman Hills about seventeen years after the abandonment of the Medallion well, and the apparent abandonment of the placer mining locations and the Morrow group-Ochsner contract; failure on the part of the personal representatives of the eleven members of the Morrow group who had died prior to January 5, 1930, to return, in any inventory, any interest in any oil lands in the Kettleman Hills; acquiescence by silence and inaction of members of the Morrow group and their successors in exclusive claims of Ochsner and successors during expensive drilling campaign.

These facts furnish ample foundation for the inference of mutual abandonment drawn from them by the trial judge.

█ Where one of two reasonable inferences may be drawn from the evidence the one actually drawn by the trial judge is final and conclusive on appeal. (*Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421 [213 Pac. 42, 26 A. L. R. 123]; *Witherow* v. *United American Ins. Co.*, 101 Cal. App. 334 [281 Pac. 668].)

The United States district judge reached a like conclusion. We quote from an opinion filed by him, as follows:

"Decision on the issues presented on behalf of the Morrow group was reserved so that a more careful examination could be given to the questions presented by their contract and the effect of the several acts of Congress. There is nothing in the contract of July 30, 1910, suggestive of a fiduciary relationship between the parties. Ochsner agreed to develop the locations to the point of discovery and while the locators agreed to take all steps required to obtain the patent he was to obtain it, but in their names and to bear the expense and generally to maintain their rights in the land.

"Title to the location, however, was at no time transferred to Ochsner. On the contrary, as suggested, patents were to issue in the names of the locators and they were then to convey to Ochsner. Assuming that the locations were deemed by them to be valid at all times the locators must

themselves have signed the necessary relinquishment in order to be entitled to a permit. 30 U. S. C., sec. 227.

"Ochsner's application in 1920 for a permit in his own name, its issuance to him in 1921, its assignment by him in 1923, all were at variance with the existence of the original contract. His default after the year 1912 to record proofs of labor or to do anything whatever upon the land was open and notorious. Yielding the utmost to the contention of the Morrow group the statute of limitations began to run at least as early as 1923.

"The total absence of activity or interest on behalf of any member of the Morrow group from 1912 to 1928 at the very earliest, argue conclusively that the project was regarded as abandoned. The defense of laches and that of limitations are clearly established."

The United States Circuit Court of Appeals also concluded that the finding of abandonment by the Medallion Oil Company was sustained by the evidence. The evidence of abandonment by the Medallion Oil Company does not differ in principle or effect from that supporting abandonment by the Morrow group. We quote the following from the opinion of the United States Circuit Court of Appeals:

"The lethargy into which they had sunk was clearly not induced by Ochsner. He may not have attempted to rouse them from it, but on this point the record is silent. . . . Ochsner used no knowledge or information concerning the character of the property which was not equally available to others of the company, or for that matter to geologists and oil men generally. He did nothing to hinder or prevent the company or any of its backers from obtaining a permit, and he appears not to have concealed the fact of his having acquired one in his own interest. The whole course of events from 1920 on was a matter of public record, or public notoriety.

"The trial court's finding that appellant abandoned the Medallion project and all interest therein is amply borne out by the record. The doctrine of the cases upon which appellant relies is not to be applied in circumstances where the principal has abandoned the subject matter of an enterprise and the agency relationship has terminated."

The instant case cannot be distinguished factually from *Hopper* v. *Elliott,* 8 Cal. (2d) 734 [68 Pac. (2d) 235], in-

volving placer mining locations made in 1909 in the Kettleman Hills. In the Hopper case the Supreme Court said:

"In natural order we may briefly discuss whether the evidence was sufficient to support the finding of abandonment. It is not necessary to go into details. The evidence establishes that after the work was stopped the casing was pulled, the derrick dismantled and the boilers, engine and pipe hauled away. No further work was done on the property. In fact, appellants did nothing until preparations were made to file this action. It cannot seriously be contended that such testimony is insufficient to support the finding. But assuming the merit of such a plan for a moment: The Pickett Act (43 U. S. C. A., sec. 142), which confirmed and approved withdrawal of public lands from oil entries provided that it should not affect *bona fide* occupants or claimants of oil or gas-bearing lands who at the date of the withdrawal order were diligently prosecuting work thereon 'so long as such occupant or claimant shall continue in diligent prosecution of said work.'"

"In the absence of a sufficient discovery to validate the location and assuming contrary to the finding that there was no abandonment in the strict sense of the term, it cannot be denied that appellants did not continue in the diligent prosecution of work subsequent to 1913 and any rights theretofore existing lapsed under the provisions of the act just quoted. (See discussion in *United States* v. *McCutchen*, 238 Fed. 575, and *United States* v. *Chanslor-Canfield Midway Oil Co.*, 266 Fed. 142.)"

Appellants seek to escape the results of the conclusions thus reached by urging that as they had given Ochsner an extension in which to perform, which was indefinite as to time, they were not called upon to do anything to protect their rights, and therefore abandonment by failure to act could not be charged to them. The argument is not convincing. Abandonment of itself presupposes an existing right at the moment it be abandoned. Even though Ochsner had an unlimited time within which to perform, an abandonment before he was in default may be inferred from the facts.

In 1 California Jurisprudence, 8, it was said:

"Another elementary proposition is that abandonment must be made by the owner without being pressed by any duty, necessity or utility to himself, but simply because he desires

no longer to possess the thing. In other words, it is a voluntary act. . . . The inference of abandonment may arise from a single act, as well as from a series of acts, continued through a long space of time." (See, also, *Middleton* v. *Newport,* 6 Cal. (2d) 57 [56 Pac. (2d) 508]; *Tupman* v. *Haberkern,* 208 Cal. 256 [280 Pac. 970].)

In 6 California Jurisprudence, 382, it was said:

"A contract may be rescinded either wholly or in part by the mutual consent of the respective parties, at any stage of their performance, and each of the parties released from any further obligation on account thereof; and such abandonment may be by parol. . . . A rescission by consent may be implied from the acts of the parties." (See, also, *Tompkins* v. *Davidow,* 27 Cal. App. 327 [149 Pac. 788]; *Sanborn* v. *Ballanfonte,* 98 Cal. App. 482 [277 Pac. 152]; *Klein Norton Co.* v. *Cohen,* 107 Cal. App. 325 [290 Pac. 613]; *Layne* v. *Bryant,* 108 Cal. App. 324 [291 Pac. 615]; *Treadwell* v. *Nickel,* 194 Cal. 243 [228 Pac. 25]; *Tuso* v. *Green,* 194 Cal. 574 [229 Pac. 327].)

The abandonment here was by mutual consent of the parties, evidenced by their conduct over a long period of years. By abandonment, the rights of the parties under the contract were effectually terminated, and the contract itself became a nullity as far as future acts were concerned.

■ The trial court found that the conduct of the plaintiffs and their predecessors constituted laches that barred their recovery. We will not again review the facts applicable to this phase of the case, except to point out that plaintiffs and their predecessors in interest stood idly by while the General Petroleum Corporation paid the Coast Land Company $5,000 in cash and promised to pay an additional $100,000 out of production for an assignment of the permit, while the General Petroleum Corporation and the General Petroleum Corporation of California expended over $1,700,000 in developing oil, and by such expenditure changed the negligible value of barren hills into the fabulous value of a rich oil field.

The United States District Court held plaintiffs and their predecessors guilty of laches. The United States Circuit Court of Appeals, in holding the Medallion Oil Company guilty of laches, said:

"Certainly, when Ochsner obtained the permit in his own interest and shortly thereafter assigned it to the Coast Land Company, there was a distinct repudiation of any agency relationship that may have been thought to persist. The appellant knew or should have known of these facts at or about the time they occurred. It stood idle during the ensuing years while others were proceeding with energy and fortitude, and at great expense, in an attempt to develop the property.

"In discussing the peremptory nature of the duty to exercise diligence which rests especially on those claiming ownership in oil properties, the Supreme Court in *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587 [23 L. Ed. 328], observes:

" 'The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing tomorrow; and that which would to-day sell for a thousand dollars as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property· to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.' "

A question involving placer mining locations in the Kettleman Hills, and similar to the one we are considering, was before the court in the case of *Livermore* v. *Beal,* 18 Cal. App. (2d) 535 [64 Pac. (2d) 987], where it was said:

"In view of the fact of the change in the value of lands by reason of the discovery of oil or gas therein, the language of Justice Brewer, quoted in the case of *Troll* v. *City of St. Louis,* 257 Mo. 626 [168 S. W. 167, 175], and approved in the Grossman case (*Superior California Fruit Land Co.* v. *Grossman,* 32 Cal. App. 357 [162 Pac. 1046]), is applicable here, to wit: 'No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts

to improve and make valuable the property he holds,' etc. Or, in other words, one is not permitted to stand by while another develops property in which he claims an interest, and then if the property proves valuable, assert a claim thereto, and if it does not prove valuable, be willing that the losses incurred in the exploration be borne by the opposite party. This thought was expressed in one case by the following language: 'If the property proves good, I want it; if it is valueless, you keep it.' . . .

''The proceedings of which the court necessarily took judicial knowledge, and of which the plaintiffs are likewise held to have knowledge, show that many years elapsed between the acquisition of rights in and to the involved premises by the respondents and their assignors, and the institution of the respective actions, and necessarily invoked the principle of laches.''

 . We will next consider the finding that appellants' cause of action was barred by the statute of limitations. The time when the statute commenced to run would depend to a considerable extent on the relationship between the members of the Morrow group and Ochsner which was created by the contract of 1910. Appellants maintain that it created a ''fiduciary relationship between the parties (which) arose from the contract because (a) it created an express trust; (b) it created a cotenancy; (c) it created a joint adventure; (d) it created a community of interest, or (e) even if it created a mere agency''. It is obvious that this argument contains the germ of its own destruction for the estates mentioned are inconsistent with each other and if one was created the others could not exist.

The United States District Court held in the opinion from which we have quoted, that no fiduciary relationship was created by the contract. We agree with this conclusion. Whatever title the members of the Morrow group had under their placer mining permits was retained by them. No part of such interest was transferred to Ochsner. The members of the Morrow group did not agree to transfer to him any part of their title until oil had been discovered and a patent issued to them in their names. Ochsner's obligation under the contract was to discover oil on the property and to protect the locator's claims during development. The obligation of the Morrow group to cause delivery of the deeds con-

veying one-half of the lands to Ochsner did not arise until after a patent had been issued. The contract was one in which Ochsner agreed to perform services and the Morrow group agreed to pay for those services in land. It is evident that Ochsner acquired no present estate in the property at the time of its execution and nothing more than the right of possession and the right of exploration. It is also clear that the parties were dealing with each other at arm's length and not in a fiduciary capacity. Ochsner had possession of the land, not in a fiduciary capacity as trustee, nor as agent, nor as a cotenant, but as a contractor who was performing services for an owner or a group having a right of possession (assuming a valid, existing placer mining location). Under these circumstances the statute of limitations would commence to run at the time of completion, if completed; at the time of abandonment, if abandoned; at the time of its breach, if broken; at the time limited for performance. Appellants contend that as the time for performance was for an indefinite period (forever, as they maintain), there was no breach and that there was nothing to start the statute running prior to the time suit was instituted. This argument overlooks the rule that, generally, where the time for performance is not fixed in a contract, it usually must be performed within a reasonable time.

If we assume, without holding, that the indefinite extension gave Ochsner an indefinite and unlimited time within which to perform, we must still conclude that the statute of limitations started running, at least, on April 16, 1921, the date Ochsner was granted his prospecting permit by the United States. On that day he received a title from an independent source (the United States of America) hostile to and conflicting with the title of the Morrow group and inconsistent with the theory that he held the land under them as locators. In *Herigstad* v. *Hardrock Oil Co.*, 101 Mont. 22 [52 Pac. (2d) 171], the court said:

"The 'prospecting permits' issued under authority of the Act of Congress (Feb. 25, 1920, chap. 85, sec. 13, 41 Stat. 441, 30 U. S. C. A., sec. 221) constitute more than a license to the permittee, and, if exclusive possession for a definite period creates an interest in land, they have this effect, for such a permit grants, in writing, 'the exclusive right, for a

period not exceeding two years, to prospect for oil or gas' upon a selected tract, . . .

"Under the act and the authorities, the government 'prospecting permit' would seem to be practically equivalent to the ordinary lease of privately owned land thought to contain oil and gas; the government merely adopts a different method of handling the matter. . . . This 'grant of a valuable right' does not differ from the grant contained in the ordinary oil and gas lease executed by the individual owner, and, whatever the rule may be in other states, in this jurisdiction such a right is held to take 'the character of an interest or an estate in the land itself. It is an interest in the land, although incorporeal.' *Marias River Syndicate* v. *Big West Oil Co.*, 98 Mont. 254 [38 Pac. (2d) 599, 601], and is sufficiently an 'interest in real estate' to support an attachment. *Williard* v. *Federal Surety Co.*, 91 Mont. 465 [8 Pac. (2d) 633].

"While the contracts subsequent to the prospecting permit are termed 'operating agreements', they are, in substance and effect, leases and not mere licenses or contracts of employment. Mere nomenclature is unimportant. 'The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession of the premises as against all the world, including the owner, in which case it is a lease.' 1 Thompson on Real Property, 761, and cases cited; 35 C. J. 954; 1 Thornton on Law of Oil and Gas, 185 and 210, note 50." (See, also, quoted portion of Circuit Court of Appeals decision in Medallion Oil Company case.)

In California it is now settled that an ordinary oil lease creates in the lessee an interest in real property. (*Callahan* v. *Martin,* 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871]; *Dabney* v. *Edwards,* 5 Cal. (2d) 1 [53 Pac. (2d) 962, 103 A. L. R. 822].)

As the prospecting permit and the lease constituted interests in real property adverse and hostile to the title of the members of the Morrow group, it follows that the action to recover an interest in the land (if it be such) was barred in five years after the date of that permit or the date of the lease, assuming they (the Morrow group or its successors) were then in possession. (Sec. 318, Code Civ.

Proc.; *Earl* v. *Lofquist,* 135 Cal. App. 373 [27 Pac. (2d) 416] ; *Cocking* v. *Fulwider,* 95 Cal. App. 745 [273 Pac. 142].)

If the action was based on the written contract of 1910, it was barred within four years. (Sec. 337, Code Civ. Proc.)

Ochsner had converted his over-riding royalty, or part of it, into stock in a corporation. If the action be construed to regain possession of this stock it would be barred within three years. (Sec. 338, Code Civ. Proc.) *Wrightson* v. *Dougherty,* 5 Cal. (2d) 257 [54 Pac. (2d) 13], was an action to recover an interest in this same stock. It was there held that the cause of action was barred in three years.

█ It follows that under any theory of the plaintiffs' case their cause of action was barred by the statute of limitations and that the trial court's finding to that effect is sustained by the evidence.

█ Plaintiffs seek to escape the effect of our last conclusions by the following argument: That Ochsner's time for performance had not expired at the time he applied for and received the prospecting permit; that he was still bound to protect the interest of the Morrow group in the land; that his application for the permit was based on the fact that he and his associates were prior locators and as such had drilled the Medallion well; that this fact gave Ochsner, through the locations by the members of the Morrow group, preferential rights in applying for the permit; that by the use of such preferential rights he was granted the prospecting permit which created a constructive trust to one-half of the three quarter sections with Ochsner, trustee, and the members of the Morrow group as beneficiaries; that Ochsner never became the owner of more than one-half of the three quarter sections; that as he assigned by way of quitclaim he did not transfer more than the one-half he owned; that consequently appellants are and have been the owners of the other half which they can recover in this action.

This argument centers around the statement in the application for the permit which we have already quoted, and is based on the assumption that the facts there stated gave Ochsner preferential rights under sections eighteen and nineteen of the Leasing Act. It is evident that this argument must fail if Ochsner did not claim preferred rights as a former occupant and claimant of the lands in the application and in receiving the permit.

The same contention was made in the Medallion Oil Company case. It was thus disposed of by the United States Circuit Court of Appeals:

"On February 25, 1920, Congress passed the Oil and Gas Leasing Act, 30 U. S. C. A., 181, 221 et seq. Sections 18 and 19 of this Act gave preference rights for a period of six months to *bona fide* occupants or claimants of oil or gas lands under claims initiated prior to any withdrawal of such lands from location or entry. This six months preference period expired August 25, 1920, and was never extended.

"In November, 1920, Ochsner made application to the Department of the Interior for a prospecting permit under this act. In his application he stated that he and his associates had drilled a well known as the 'Medallion' on the land applied for, and he appended a log of the well together with a statement of expense. Since his application was not made under sections 18 and 19 of the act, it is apparent that his reference to these earlier activities was not for the purpose of inducing the Department to grant him preferred rights, but was intended as a recital of his personal qualifications. The statement is contained in a paragraph in which he relates his experience as a geologist and oil operator and his standing as a business man."

On December 4, 1936, the trial judge granted the motions for nonsuit of the Universal Oil Land Company and of California Kettleman Oil Royalties, Inc. An appeal was taken from this judgment. Formal judgment was entered against plaintiffs and in favor of defendants on February 11, 1937. An appeal was also taken from this judgment. While no separate record is presented on the first appeal, no question of the sufficiency of the record is presented by counsel and we will not raise it.

The judgments are affirmed.

Barnard, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 1, 1938, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 5, 1939.