[Civ. No. 2750. Fourth Dist.—June 23, 1941.]

BESSIE E. ARNOLD, Appellant, v. UNIVERSAL OIL LAND CO. (a Corporation) et al., Respondents.

Henry Schaefer, Jr., and William E. Burby for Appellant.

Michael F. Shannon, Thomas A. Wood and Sullivan, Roche & Johnson for Respondents.

MARKS, J.—On October 11, 1937, plaintiff filed her original complaint in this action to establish a trust in oil royalties in her favor and to quiet her title to the royalties. A second amended complaint was filed on March 17, 1939, to which general and special demurrers to each of the three causes of action were sustained without leave to amend, after counsel for plaintiff had stated to the trial court that there were no facts in addition to those alleged that could be pleaded to support plaintiff's case. The trial court granted the motion for judgment on the pleadings made by certain defendants. This appeal was taken from the judgment of dismissal. Hereafter we will refer to the second amended complaint as the complaint.

The oil interests involved grow out of a prospecting permit issued by the United States to Washington H. Ochsner on April 16, 1921, under the terms of the Oil Land Leasing Act which was passed by the Congress on February 25, 1920. (30 U. S. C. A. sec. 181, et seq.) The permit covered land in the Kettleman Hills Oil Field which has become very valuable because of the large production from it of high gravity oil. Ochsner's dealings with this property have provided the source of much litigation. (See, *Dougherty* v. *California Kettleman Oil Royalties, Inc.*, 9 Cal. (2d) 58 [69 Pac. (2d) 155] ; *Medallion Oil Co.* v. *Hinckley*, 92 Fed. (2d) 155; *Morrow* v.

*Coast Land Co.*, 29 Cal. App. (2d) 92 [84 Pac. (2d) 301].)
Plaintiff claims to be the owner of certain overriding royalties
from the oil produced from this property which were reserved
by Ochsner to himself, by reason of her purchase of them
from him on August 17, 1923.

The complaint contains three counts which we must analyze
with considerable detail.

The first count alleges the corporate existence of the Uni-
versal Oil Land Company, The California Kettleman Oil
Royalties, Inc., and the General Petroleum Corporation of
California. It also alleges that Hilda Carling Hinckley is
the administratrix of the Estate of Washington H. Ochsner,
deceased, and that Bernice A. Monks and H. L. Monks are the
administrators of the Estate of R. H. Arnold, deceased. It
contains the usual allegations concerning the defendants sued
under fictitious names.

It is further alleged that on April 16, 1921, the United
States, through its Department of the Interior, issued to
Washington H. Ochsner an exclusive oil and gas prospecting
permit, a copy of which is attached to the pleading, which
permitted him to prospect for oil on described government
land for a period of two years; that on August 7, 1923,
Ochsner assigned the permit to the Coast Land Company,
reserving to himself 7½ per cent of the oil and gas produced
from the discovery area, and 2½ per cent of the oil and gas
produced from the balance of the property; that on Octo-
ber 8, 1923, the Coast Land Company assigned its interest
in the permit to the General Petroleum Corporation, the
predecessor in interest of defendant, General Petroleum Cor-
poration of California; that the foregoing assignments were
approved by the Secretary of the Interior of the United
States; that the General Petroleum Company of California
was the owner and holder of the permit subject to the over-
riding royalties reserved to Washington H. Ochsner; that on
August 17, 1923, plaintiff purchased the overriding royalties
for $30,000.00 which was paid to Ochsner from her separate
property; that she purchased in good faith and without notice
of any claims upon or to the overriding royalties.

The foregoing allegations are contained in paragraphs one
to nine, inclusive, of the first cause of action of the complaint.

It is further alleged "that on or about the 21st day of
July, 1903, plaintiff married R. H. Arnold, and remained his

wife until the time of his decease on or about the 19th day
of August, 1931. Plaintiff, from the time of her marriage,
had confidence in his honesty and integrity. During the
period of time mentioned the said R. H. Arnold advised the
plaintiff with respect to the investment of her separate estate
and acted for and in her behalf in many business transac-
tions. That during the period of time mentioned plaintiff
relied solely upon the advice and counsel of her husband,
the said R. H. Arnold, and entrusted large sums of money to
his care and management. That, while plaintiff was not
experienced in business affairs, many of the business transac-
tions entrusted to her husband proved highly successful.
That during the period from 1918 to 1923 plaintiff, acting
through her husband, the said R. H. Arnold, invested large
sums in the ship building industry. During the year 1923,
and as a result of that investment, plaintiff paid an income
tax on one-quarter of a million dollars''; that prior to
August 17, 1923, plaintiff was domiciled in Greenwich, Con-
necticut; that her husband was financially interested in oil
properties in California; that R. H. Arnold advised plaintiff
to invest in oil properties owned by Washington H. Ochsner;
that she came to California and in July, 1923, negotiated for
the purchase of the oil royalties involved, at a meeting at
which plaintiff, her husband and Ochsner were present; that
the purchase was ''confirmed'' on August 17, 1923; that on
that date Arnold, Ochsner and Richard Young were the
owners of practically all of the stock of the Universal Oil
Land Company, with Young holding a nominal interest
therein; that Arnold and Ochsner were officers and directors
of the Universal Oil Land Company which was their *alter
ego* used for the purpose of carrying on their private trans-
actions in connection with oil investments; that in the pur-
chase of the overriding royalties from Ochsner, plaintiff re-
lied upon the assurances of Arnold and Ochsner ''that her
interest, as owner, would be properly protected''.

The allegations which we have just summarized in the fore-
going paragraph, appear in paragraphs ten to thirteen, in-
clusive, of the first cause of action of the complaint.

It is further alleged that without the knowledge of plain-
tiff, Arnold and Ochsner caused the overriding royalties pur-
chased by plaintiff, to be transferred without consideration
to the Universal Oil Land Company, their *alter ego,* which

"acquired with notice of plaintiff's title"; that plaintiff made frequent inquiries of her husband concerning her investment and was informed by him that it was secure; that she should forget it for the time because production of oil had not been started; that because of her confidence in and relation to Arnold, plaintiff relied upon his representations to her; that after August 17, 1923, plaintiff returned to her home in Greenwich, Connecticut, and continued to reside in Connecticut and in Washington, D. C. until prior to 1936; that until 1937, plaintiff continued to have full confidence in the honesty and integrity of her husband and continued to rely upon his statements that her investments were in proper order.

It is further alleged that in 1928, plaintiff was first informed that her husband was unfaithful to her and, as early as 1923, had been carrying on "an intimate relationship" with another woman; that in 1928, plaintiff instituted an action for divorce against her husband; that "a New York decree" awarded her over $3000.00 a month temporary alimony, payments of which were to continue pending negotiations for a property settlement; that because of the involved condition of Arnold's affairs no property settlement had been made and no divorce decree had been entered at the time of his death in 1931.

It is also alleged that since 1925, plaintiff had been suffering from cancerous infections and had undergone many serious operations and had been constantly under the care of physicians and surgeons; that because of her illness she had been unable to take any active part in her business affairs; that on December 17, 1928, Arnold, Young, and "the Estate of Washington H. Ochsner" owned all, or practically all, of the stock of the Universal Land Oil Company; that at that time and within a few weeks after plaintiff had filed her suit for divorce, as a further means of concealing from her the true state of her affairs, Arnold caused the California Kettleman Oil Royalties, Inc., to be incorporated; that its sole stockholders were Arnold, Young, and the Estate of Washington H. Ochsner; that the corporation was the *alter ego* of Arnold who caused the oil royalties to be assigned to it by the Universal Oil Land Company without consideration but with notice of plaintiff's interest therein; that these practices amounted to active concealment of the true facts

concerning her oil royalties from plaintiff who did not know and did not have the means of discovering those true facts until June, 1937, when the decision in the case of *Dougherty v. California Kettleman Oil Royalties, Inc., supra,* was called to her attention; that from the time she instituted the action for divorce against her husband in 1928, it was impossible for her to ascertain the true facts concerning his, or her own property; that from the time Arnold started to associate with the other woman in 1923, he started to conceal from plaintiff facts with respect to his own estate and in respect to the monies she had entrusted to him for investment; that Arnold's affairs were so involved that his estate is still in the process of probate.

In paragraph twenty-two of the first cause of action it is alleged that each of the defendants claims some interest in the overriding royalties but that none of them has any interest therein; that such right, title or interest, if any, is subject and subordinate to the claims of plaintiff herein.

The second cause of action incorporates within itself, by reference, the first to the thirteenth paragraphs, inclusive, and the twenty-second paragraph of the first cause of action. It is there alleged that the Universal Oil Land Company paid no consideration for the assignment to it of the overriding royalties, but "agreed with this plaintiff that it would hold the said overriding royalties in trust for the plaintiff"; that the California Kettleman Oil Royalties, Inc., was the *alter ego* of the Universal Oil Land Company; that each corporation had the same stockholders and directors; that the California Kettleman Oil Royalties, Inc., succeeded to the office of trustee for plaintiff formerly held by the Universal Oil Land Company, and "now repudiates its trust and denies that this plaintiff has any interest in the 'overriding royalties' ".

Plaintiff has incorporated by reference into the third cause of action, paragraphs one to nine, inclusive, of the first cause of action and has added thereto a second paragraph which is a substantial repetition of paragraph twenty-two of the first cause of action.

It is too elemental to need the citation of supporting authorities, that a demurrer admits the truth of all of the well pleaded allegations of a complaint, subject to the exception hereafter mentioned. It is also equally well settled that the

courts must take judicial notice of the public and private official acts of the legislative, executive, and judicial departments of this State and of the United States government (Sec. 1875, Code Civ. Proc.); that judicial notice must be taken of the records of the General Land Office of the United States (*Southern Pacific Co.* v. *Lipman,* 148 Cal. 480 [83 Pac. 445]) and of regulations of the Department of the Interior (*Whittaker* v. *Pendola,* 78 Cal. 296 [20 Pac. 680]); that the judicial notice comes to the aid of a pleading when such aid is necessary (*Ohm* v. *City and County of San Francisco,* 92 Cal. 437 [28 Pac. 580]); that facts alleged, which are contrary to those facts of which judicial notice is taken, cannot be regarded as true. (*French* v. *Senate of California,* 146 Cal. 604 [80 Pac. 1031, 2 Ann. Cas. 756, 69 L. R. A. 556]; *Fey* v. *Rossi Improvement Co.,* 23 Cal. App. 766 [139 Pac. 908]; *Sheehan* v. *Vedder,* 108 Cal. App. 419 [292 Pac. 175]; *Livermore* v. *Beal,* 18 Cal. App. (2d) 535 [64 Pac. (2d) 987].)

█ It is therefore clear that we must measure the vulnerability of each count of the complaint to demurrer by those facts which are well pleaded and also by those additional facts of which both the trial court and this court must take judicial notice, for, as said in *Livermore* v. *Beal, supra,* "complaints must each one be read as though they incorporated everything of which the courts are bound to take judicial knowledge". (See, *Chavez* v. *Times-Mirror Co.,* 185 Cal. 20 [195 Pac. 666.)

█ We are required to take judicial notice of the following facts, among others, that have an important bearing on the issues here presented.

That all the various assignments were of record in the Land Office and were approved by the Secretary of the Interior, except the oral assignment of the royalties to plaintiff.

That on January 24, 1924, actual drilling for oil was started by the General Petroleum Corporation on the permit property and the first well was abandoned on March 17, 1926; that a second well was started by the General Petroleum Corporation of California, after the approval of the assignment of the permit to it, on April 26, 1927, and was brought in as a large producer on January 8, 1930; that royalties were thereafter paid to the United States of America.

That on March 5, 1929, a third well was started which was placed on production on January 14, 1930; that royalties were paid to the United States of America.

That on July 23, 1930, the United States of America issued a lease on 640 acres of the permit land to the General Petroleum Corporation of California, and on January 9, 1931, executed another lease to the same corporation on another 1898.24 acres of the permit land, both being based on the discovery of oil as a result of the successful drilling operations; that royalties were paid to the United States of America.

That various land owners, including the United States of America, operating permittees, lessees, and owners of participating interests in the oil rights, formed the Kettleman North Dome Association; that this association was made the agent for the prudent and orderly drilling for, producing and marketing of the petroleum products produced in the district which included the land here involved, together with the payment of royalties; that in 1931 the Secretary of the Interior approved the formation of this association and so reported to the Congress.

It has been held that persons interested in the subject matter of the records and orders of the Land Office and the actions of the executive officers of the United States concerning them, of which the courts are required to take judicial notice, are also charged with notice of them and that laches may be predicated on such notice. (*Livermore* v. *Beal, supra.*) (See, also, *Socrates Quicksilver Mines* v. *Carr Realty Co.,* 130 Fed. 293 [64 C. C. A. 539].)

Defendants rely principally on the laches of plaintiff in pressing her claim, and on the bar of the statute of limitations.

 The question of laches may be raised by demurrer if laches appears on the face of the complaint and in the facts of which the courts must take judicial notice. (*Seculovich* v. *Morton,* 101 Cal. 673 [36 Pac. 387, 40 Am. St. Rep. 106]; *Kleinclaus* v. *Dutard,* 147 Cal. 245 [81 Pac. 516]; *Superior California Fruit Land Co.* v. *Grossman,* 32 Cal. App. 357 [162 Pac. 1046]; *Livermore* v. *Beal, supra.*)

In speaking of laches in the last cited case, the court used the following language:

"In view of the fact of the change in the value of lands by reason of the discovery of oil or gas therein, the language

of Justice Brewer, quoted in the case of *Troll* v. *City of St. Louis*, 257 Mo. 626 [168 S. W. 167, 175], and approved in the Grossman case, is applicable here, to-wit: 'No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds,' etc. Or, in other words, one is not permitted to stand by while another develops property in which he claims an interest, and then if the property proves valuable, assert a claim thereto, and if it does not prove valuable, be willing that the losses incurred in the exploration be borne by the opposite party. This thought was expressed in one case by the following language: 'If the property proves good, I want it; if it is valueless, you keep it.' ''

█ Plaintiff claims to have purchased the overriding royalties from Ochsner in 1923. She is charged with notice of the various transfers of interests in the permit property appearing in the Land Office; that oil was discovered on the property in 1929; that two wells were placed on production in January, 1930; that the leases based on production were granted; that royalties were being paid; that the Kettleman North Dome Association was organized in 1931 to manage property of which the Ochsner permit property was a part; that royalties were being paid regularly to the United States as owner of Ochsner's permit property.

A simple letter to the General Petroleum Corporation of California would have disclosed that large quantities of petroleum products had been produced from the permit land and from other land under the management of the Kettleman North Dome Association. Before plaintiff's action was filed the General Petroleum Corporation of California had realized a gross income of about $14,000,000.00 from the permit property. (*Morrow* v. *Coast Land Co.*, *supra*.)

█ Plaintiff gives two excuses for her utter failure to make any effective inquiry concerning, or to take the slightest interest in, the valuable property she claims to have purchased for the not inconsiderable sum of $30,000.00, between

August, 1923, and June, 1937, a period of almost fourteen years. In this time the character of the land in which she claimed an interest had changed from sheep pasture of little value to a great oil producing property. She urges first, that she was grievously ill, and second, that she was lulled into a sense of security by her great trust and confidence in the honesty and integrity of her husband, which lasted until 1937, unshaken by the vicissitudes of divorce proceedings and a lengthy attempt to discover his assets and secure a property settlement from him. Such childlike simplicity and faith are indeed remarkable in a case where the wife knew that the trusted husband had been faithless to his marriage vows and for several years had lavished his affections on another woman.

Plaintiff's allegations as to her illness are contained in paragraph eighteen of the first cause of action where it is very generally alleged that she had been ill since 1925 from cancerous infections and had undergone many serious operations which made it impossible "for her to take any active part in connection with her business affairs". Paragraph twenty of the first cause of action assigns this serious illness as one of the reasons why she did not discover the true condition of the record ownership of her overriding royalties. Neither of these allegations was incorporated in either of the other two causes of action, so those causes of action fail to allege this reason why she failed for a number of years to discover the fraud perpetrated upon her.

It should be observed that there was no change in her alleged physical condition between 1925 and the time the complaint was filed. The allegation that she could take no "active part" in her business affairs is most indefinite and does not necessarily disclose the extent of her disability. Many persons, not in the best of health, are not active in the management of business but are able to supervise agents who do so. Because of this uncertainty we may measure the degree of her disability by her alleged activities during this time.

According to the allegations of her complaint, she was well enough in 1928 to institute an action for divorce against her husband in the courts of New York. Under the laws of that state she had either to file the action *in propria persona* or employ attorneys to represent her. She was successful in

securing an award of over $3000.00 a month as temporary alimony and spent almost three years in investigating the "involved condition" of her husband's property in order to arrange a property settlement with him. Whether she acted for herself or through attorneys does not appear. If she was well enough to manage this litigation and the negotiations for a property settlement herself, or to direct her attorneys to do so, it would seem that she was well enough either to write herself or to direct her attorneys to write to the Land Office to inquire about the oil development on the Ochsner permit property.

During this time she is charged with notice that oil had been developed in large quantities on this property and that royalties were being paid out of this production. She must have known that she was not receiving any part of these royalties to which she now claims she was entitled. The failure to pay these royalties was a breach of the trust which she now claims existed in her favor. Still she did nothing for more than six years.

Her husband died in 1931. After that time she had no right to rely on the representations he had made, as she alleges she did, "believing that he would fully account to her at the proper time". The "proper time" for an accounting, at the latest, was when she was entitled to payments on the overriding royalties. The two wells were brought in in January, 1930, entitling her to royalties. She did nothing for over six and one-half years. She waited to file her action for more than six years after the death of the last person, other than herself, who had knowledge of the terms of her purchase.

The complaint in this action was verified in Los Angeles County in 1939. Some time before, and during the period of her alleged disability, she had traveled from her eastern abode to California, had employed attorneys and had instituted this action. According to her complaint she was still suffering from the same physical disabilities which had prevented her from taking any active part in the management of her financial affairs since 1925.

These allegations show rather clearly that her illness was not so sufficiently severe as to incapacitate her from at least employing others to investigate her oil interests. Charged with notice of the value of her investments in 1930, and

having done nothing about them until after June, 1937, her laches sufficiently appears from the allegations of her complaint, and the facts of which we must take judicial notice, to justify the sustaining of the demurrer without leave to amend.

What we have already said is sufficient to support the conclusion that plaintiff's demand was barred by the statute of limitations. This is particularly true as to the second and third causes of action.

The breach of trust occurred at least as early as 1930 when her trustee failed to account to her for the royalties to which she claims she was entitled. She is charged with notice that she should have been receiving them. She had available a simple method of discovering the facts. She was required to learn those facts which could easily have been brought to light, and she must be presumed to have known that which, with reasonable diligence, she could have learned. (*Simpson* v. *Dalziel,* 135 Cal. 599 [67 Pac. 1080] ; *Henigan* v. *Yolo Fliers Club,* 208 Cal. 697 [284 Pac. 906].) Therefore, knowledge of the fraud must be imputed to her at least six years before her action was filed. It follows that the plea of the bar of the statute of limitations was properly sustained.

Some, but not all, of the defendants moved for judgment on the pleadings. The motion was granted. Plaintiff urges that this was error for the reason that where the defendants have appeared by demurrer only, a motion for judgment on the pleadings is inappropriate. Conceding the soundness of this argument, it furnishes no ground for reversal of the judgment as the proper sustaining of the demurrer without leave to amend sufficiently supports the judgment.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied July 16, 1941, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1941. Carter, J., voted for a hearing.