[Civ. No. 22040. Second Dist., Div. Three. Aug. 5, 1957.]

PHILIP PRESZLER, Appellant, v. RICHARD DUDLEY et al., Defendants; ALVIN PRESZLER et al., Respondents.

Herbert C. Schulze for Appellant.

Frank C. Nimocks for Respondents.

VALLÉE, J.—Appeal by plaintiff from a judgment in his favor for $400 in an action for damages based on an alleged agency to purchase shares of capital stock in a corporation.

Plaintiff is the brother of defendants Alvin Preszler and Helmuth Preszler who were the principals in Concrete Equipment Manufacturing Company, a corporation. Defendants had been operating the business for some time. One of the stockholders in the corporation was Richard Dudley, a brother-in-law of defendant Alvin. Early in 1952 Dudley expressed a desire to defendants to sell his stock and withdraw from the company. Defendants, needing additional help and desiring to keep the corporation in the family, made an offer to plaintiff that if he would devote his time and energies to the business they would help him purchase the stock from Dudley. Defendant Helmuth testified he talked to plaintiff about the latter's becoming employed by the company, "[t]hat is the only way that it would be possible for him to buy the stock." About March 1952 plaintiff went to work for the corporation. A few days after he started to work plaintiff told defendants he could raise only $600. Defendants told plaintiff they would loan him $2,400 so that he could make the initial down payment of $3,000. Plaintiff told them how he could get the money to repay the $2,400.

On April 2, 1952, Dudley agreed in writing to sell 6,955 shares of his stock to plaintiff for $6,955. Plaintiff's $600 together with the $2,400 from defendants was given to Dudley by Alvin. The agreement stated that the balance of $3,955, representing 3,955 shares, was to be paid on or before July 2, 1952, without interest "with any balance unpaid after that date to be paid on or before April 2, 1953, with interest

at the rate of 6% per annum starting July 2, 1952. Transfer of stock to be made after full amount of $6955.00 has been paid.''

In August, 1952, plaintiff told Alvin he intended to quit working for the corporation. Alvin testified he then advised plaintiff that ''in the original agreement he [plaintiff] agreed to stay with the company and that we [defendants] had advanced most of the money for his benefit and that if he intended to be part of the company he was going to have to complete this agreement, including working for the company.'' Plaintiff then quit working for the company. After plaintiff had quit Helmuth talked to him about returning to work. Plaintiff said he would not work for Alvin; and when Helmuth mentioned the purchase agreement, plaintiff said, ''Well, I can't possibly raise the money.'' Later Helmuth stated to plaintiff, ''If you don't pay for that stock we will have to protect our interest that we already have in the stock.'' Alvin testified plaintiff never made any effort to complete the agreement to purchase the stock; Dudley was anxious to receive the balance of his money; defendants felt obligated to make the final payment to him; consequently, they felt to protect their own interest in the deal the stock should be registered in their names. In December, 1952, defendants paid Dudley the balance of the purchase price for the stock and received the stock certificates which were taken in their names. In March, 1953, plaintiff telephoned Dudley about paying the balance. Dudley told him he did not know anything about the money plaintiff owed him and that he should contact Alvin.

It was stipulated that in February, 1953, $200 was offered to and accepted by plaintiff from Helmuth. Helmuth testified it was a partial repayment of the $600 plaintiff contributed to the down payment for the stock. He testified: ''I mentioned giving him a check for part of that money that he had invested in Concrete Equipment because it didn't look as though he was going to continue his deal. He wasn't going to complete his final deal. I said to him, 'Phil, you might as well have the $600.00 that you put into this company back because I don't want any of your money and I will give you a check for it.' And his wife mentioned the fact, she says, 'Where would we cash a check?' She says, 'Could you give us cash?' And I says, 'I will give you $200.00.' Which I happened to have in my pocket at the time.'' About two months later Helmuth offered the balance of the $600 to

plaintiff. Plaintiff said he didn't know whether he was going to take it or not. Helmuth left a check for $400 lying on a desk and walked out. It never was cashed.

The court found that at the time defendants obtained the stock they were no longer acting as agents of plaintiff; "prior to said time the agency had been abandoned"; defendants returned $200 of the $600 that they received from plaintiff to him; defendants offered to pay but plaintiff refused to accept the balance of $400; a balance of $400 is due from defendants to plaintiff. Judgment was for plaintiff in the sum of $400.

Plaintiff contends defendants were still acting as his agents in December, 1952, when they paid the balance of the purchase price for the stock because the agency had not been terminated, since abandonment is not one of the methods expressly provided in sections 2355 and 2356 of the Civil Code for terminating an agency. Section 2355 provides that an agency is terminated by: "1. The expiration of its term; 2. The extinction of its subject; 3. The death of the agent; 4. His renunciation of the agency; or, 5. The incapacity of the agency [agent] to act as such." Section 2356 states that when the power of an agent is not coupled with an interest in the subject of the agency, it is terminated by: "(1) Its revocation by the principal; (2) his death; or, (3) his incapacity to contract." In *Boehm* v. *Spreckels,* 183 Cal. 239 [191 P. 5], the Supreme Court, after quoting these sections, stated (p. 248) : "It is also an established rule that a sale of the subject of the agency made in good faith by the principal operates as a termination of the agency and is equivalent to a revocation thereof. (1 Mechem on Agency, § 698.)" Mechem says an abandonment by the agent may be treated as renunciation. (1 Mechem on Agency 460, § 646; *Rudolph* v. *Andrew Murphy & Son,* 121 Neb. 612 [237 N.W. 659, 661]. Also see 2 C.J.S. 1169, § 81.)

■ An agency usually depends on the assent of both parties and therefore may be revoked by the principal or renounced by the agent at any time. (*Roth* v. *Moeller,* 185 Cal. 415, 418 [197 P. 62] ; 2 C.J.S. 1153, § 73, p. 1169, § 81.) Substantially correlative to the power of the agent to withdraw his assent is the power of the principal to withdraw his assent. ■ Even though it may not be terminated by the act of one of the parties, it may, given the necessary conditions of form and consideration, be terminated through the subsequent release by the party in interest, or the agreement of

both parties to rescind or cancel the contract between them. (1 Mechem on Agency 399, § 559; 2 Am.Jur. p. 37, § 36, p. 45, § 48.) A mutual abandonment of an agency terminates the relationship between the parties. (*Treadwell* v. *Nickel,* 194 Cal. 243, 258 [228 P. 25]; *Morrow* v. *Coast Land Co.,* 29 Cal.App.2d 92, 107 [84 P.2d 301]. See *Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634, 644 [160 P.2d 804].) Whether an agency was mutually abandoned is a question of fact. An abandonment is a matter of intent and is to be ascertained from the facts and circumstances surrounding the transaction out of which the abandonment is claimed to have resulted; it may be implied from the acts of the parties. (*Treadwell* v. *Nickel, supra,* 194 Cal. 243, 259; *Morrow* v. *Coast Land Co.,* 29 Cal.App.2d 92, 107 [84 P.2d 301]; *Lohn* v. *Fletcher Oil Co., Inc.,* 38 Cal.App.2d 26, 30 [100 P.2d 505]; *Waldteufel* v. *Sailor,* 62 Cal.App.2d 577, 581 [144 P.2d 894]; *Tucker* v. *Schumacher,* 90 Cal.App.2d 71, 75 [202 P.2d 327].)

The agreement between plaintiff and defendants was that in consideration of plaintiff's becoming an employee of the corporation defendants would give him an opportunity to purchase Dudley's stock. Plaintiff left the corporation after working five months. He accepted the $200 in part repayment of the $600. He did not at any time offer to reimburse defendants for the $2,400 they paid to Dudley. He never expressed any interest in the purchase of the stock until three months after defendants completed the purchase and eight months after he quit. The court could reasonably infer that plaintiff abandoned the agency and that defendants consented thereto. The findings that defendants returned $200 to plaintiff as partial repayment of his $600 contributed to the down payment on the stock and that only a balance of $400 is owing to plaintiff are supported by substantial evidence.

Plaintiff asserts that prejudicial error occurred by the trial judge's refusing and interfering with the interrogation of Alvin. The following transpired: "Q. [BY MR. SCHULZE, attorney for plaintiff] At that time that you paid the $3955.00 were you acting in behalf of Philip Preszler? A. That is rather—— THE COURT: Wait. That is the whole issue here, isn't it, counsel? MR. NIMOCKS: Objected to on that ground, your Honor. THE COURT: You are asking him to decide a question of law. MR. SCHULZE: The question was answered

at a previous time. . . ." No prejudicial error occurred. As plaintiff's counsel stated, the identical question had been previously answered by Alvin.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.