[L. A. No. 17484.   In Bank.—February 17, 1941.]

E. DRILLON, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and CLAUDE HOOPER, Respondents.

Whelan & Whelan for Petitioner.

Everett A. Corten for Respondents.

Earl Warren, Attorney-General, John J. Dailey, Deputy Attorney-General, Maurice P. McCaffrey, Lee Stanton and Chas. A. Son, as *Amici Curiae,* on behalf of Respondents.

CARTER, J.—Petitioner seeks an annulment of an award made against him by the Industrial Accident Commission in favor of Claude Hooper, a jockey suffering injuries while riding a horse for petitioner in a race at Del Mar, California. The respondent Commission found that Hooper was an employee, as against the defense that he was an independent contractor and accordingly made the award to Hooper including an increased indemnity as petitioner was found to be wilfully uninsured. Hooper was injured on August 22, 1939, as the result of a fall when the horse he was riding for petitioner stumbled.

Hooper was regularly employed by Senator Jack Metzger on a monthly salary basis to exercise Metzger's horses and to ride them in races when Metzger desired. However, his contract of employment permitted him to ride horses for other persons when that could be done without interfering with his duty to Metzger, and for such rides he received compensation in addition to his monthly salary. Hooper was licensed as a jockey by the California Horse Racing Board under the Horse Racing Act of California (Stats. 1933, p. 2046, as amended [Deering's Gen. Laws, 1937, Act 3421]). Pursuant to the rules adopted under the Racing Act, there are certain regulations pertaining to the conduct of jockeys; more will be said about those rules later herein.

During the racing season of 1939, petitioner, having a string of horses at the Del Mar track and racing them, engaged Hooper for the first time to ride his horse, Pomposa, in a single race on August 22, 1939; Hooper was to be paid $10 if the horse lost and $25 if he won. The engagement was made through Charlie Thompson, an agent of Hooper, who obtained mounts for him to ride. Hooper's first personal contact with petitioner was when the latter came to the paddock just before the race at which time petitioner instructed Hooper how to handle the horse in the race. In this connection Hooper testified.

"Q. What instructions did he (petitioner) give you that day?

"A. Well, as far as I can remember, *Mr. Drillon* (petitioner) *told me* the horse didn't have much speed and *to let him run his own race until the last quarter of a mile and then do the best I could from* there on. . . . I think *Mr. Drillon told me to hit him* (the horse) *four or five times and if he responded, all right, and if not, not to whip him no more.*

"Q. . . . Did Mr. Drillon give you instructions as to how to ride that horse in that race?

"A. Well, yes . . . What I mean by that, you see any time an owner or a trainer puts a rider on the horse, he tells him how to ride. Now, his exact instructions, how many times to hit him. . . . *Mr. Drillon gave me orders and told me how to ride the horse.*

" . . . The stewards at any time at all *if Mr. Drillon went in there and said, 'I don't want this boy to ride this horse,'* and *the stewards could take me off his horse,* . . .

"Q. Now, what was Mr. Drillon's language when you went down to the paddock?

"A. Well, I tell you, that has been three months ago and to remember his exact words, I couldn't do it, but as far as getting any, you can ask any horseman or any rider or anybody that has ever rode a race, and he will tell you the owner gives you instructions how to ride the horse. . . .

"Q. I thought I understood you to say to the Commissioner that when you were there in the paddock, ready to mount the horse, that Mr. Drillon told you to let the horse run his own race to the last quarter of a mile and then do the best you could?

"A. *Yes, and then to hit him three or four times, and if he didn't run for the whip, then to hit him no more.*

"Q. Now, you knew when you accepted the mount from Mr. Drillon, did you not, that the stewards had authority to instruct and advise the jockeys in the race how they should ride the particular horse they were riding?

"A. No, the stewards don't tell the riders how to ride the horse. The owner or the trainer tells the rider, gives them their instructions. . . .

"Q. And if a horse is inclined to bear out wide as he goes around the curve, they tell you to watch as he goes around the curves and make him go straight?

"A. Once in awhile, if it is a very unusual horse, why they (stewards of racing clubs) might tell you at curves, but as far as giving you any instructions or telling you how to ride, no, they don't. That is up strictly to the owner or the trainer."

Petitioner contends that the evidence shows that the only purpose of the instructions was the final result sought to be accomplished, that is, winning the race, rather than an exercise of control and direction over the means to be employed in accomplishing that purpose, and that therefore Hooper was an independent contractor and not an employee. We cannot agree with that contention. Those instructions advised Hooper precisely how to ride the mount; he was ordered to permit the horse to run his own race to the last quarter mile and then to whip him three or four times but if that amount of whipping were not effective to whip him no more. Ordinarily there would be no occasion for being more particular in the instructions as to the method and means by which the ride should be made. There were ends to be gained by the instructions, other than winning the race, notably the effect of whipping on the horse's health and on his performance in future races. Certainly if a horse is improperly managed in a race, that mismanagement will be reflected in the condition and performance of the horse thereafter. It is of no consequence that it might be inferred that petitioner was merely acquainting Hooper with the characteristics of the horse to assure success in the race or that other inferences from those instructions might arise supporting the independent contractor theory, when we are mindful of the rule that the Commission's finding of an employee-employer relation is conclusive on this court unless there is an entire lack of evidence to support it or the only inference that can be drawn from the evidence is contrary to it. (*Los Flores School Dist.* v. *Industrial Acc. Com.*, 13 Cal. App. (2d) 180 [56 Pac. (2d) 581] ; *Hillen* v. *Industrial Acc. Com.*, 199 Cal. 577 [250 Pac. 570] ; *Schaller* v. *Industrial Acc. Com.*, 11 Cal. (2d) 46 [77 Pac. (2d) 836].) And also it must be kept constantly in mind that under the workmen's compensation laws the burden of establishing the defense of independent contractor relation rests on the employer, not the employee, when services have been performed. (Labor Code, sec. 5705; *Murray* v. *Industrial Acc. Com.*, 216 Cal. 340 [14 Pac. (2d) 301].) Nor is it important that Hooper was paid $10 if he

lost and $25 if he won, as indicating that the final result to be accomplished was the only purpose of the instructions. On the contrary the very fact that he would receive $10 if he lost, establishes that the winning of the race was not the only result sought, otherwise he would receive nothing if he lost. In any event, it is a situation not dissimilar to an employee whose compensation is based solely on commissions on the sales made by him. The fact that his compensation is thus contingent does not of itself make him an independent contractor. (*Brown* v. *Industrial Acc. Com.*, 174 Cal. 457 [163 Pac. 664].)

█ Petitioner also urges that because he could not have communicated with Hooper and discharged him after the race commenced and as only a single race was to be run, he did not have authoritative direction and control of Hooper and could not discharge him. Of course the power to discharge a person furnishing services is a significant factor in the issue involved, and here the evidence shows that petitioner had the *power and authority* to discharge. He could have dismissed Hooper any time until he was physically out of reach. But the test is whether petitioner had the right or authority to discharge Hooper, and it is of no consequence that because of physical inability he was unable to communicate his exercise of such authority to Hooper. Certainly if Hooper in response to petitioner's instructions on how to ride the horse, had replied that he would ride him as he pleased and ignore the instructions, petitioner would have had the right to immediately discharge him in response to such refusal to obey. The fact that Hooper was employed for a single race only is not controlling. In *Murray* v. *Industrial Acc. Com.*, *supra*, the applicant, an airplane pilot, was engaged for the sole task of delivering a plane owned by his employer to a certain place. His compensation was to be his expenses en route. The pilot was held to be an employee and not an independent contractor, although he was entitled to choose the route to his destination. That case is so closely similar to the case at bar that it is determinative of it. Although the precise issue here involved has never been determined in California, there are many persuasive authorities from other states. In *Moore* v. *Clarke*, 171 Md. 39 [187 Atl. 887, 107 A. L. R. 924], the jockey was employed for a single race for a compensation fixed by the Jockey Club. It appeared that the owner of the horse or the trainer gave instructions as to how to ride the horse but generally with experienced jockeys few instructions were

given. Nevertheless the jockey was found to be an employee. *Pierce* v. *Bowen,* 247 N. Y. 305, 160 N. E. 379, involved an employment of a driver to drive horses in four races for $15 per race. He received an injury in the first race. The court said at page 379:

"He (driver) was directed by the respondent to drive the horse with the rein not too tightly drawn. He was directed to drive on the outer circumference of the track in order to avoid frightening the horse. These instructions, and many others which might have been given, it was claimant's duty to honor under the penalty of a discharge for disobedience. Consequently the claimant was a servant and the respondent was his master."

██ We think it is clear therefore that the evidence is sufficient to support the respondent Commission's finding that Hooper was an employee and not an independent contractor. However, petitioner makes the further contention that by reason of certain rules adopted by the California Horse Racing Board pursuant to its power so to do under the Horse Racing Act, Hooper is an independent contractor, because those rules involved the right of petitioner to discharge Hooper and the latter's right to refuse to ride the race. The court of course takes judicial notice of those rules (Code Civ. Proc., sec. 1875). It is worthy of note that the declaration of the board in making the rules states that "They have been compiled with the hope that they will promote *racing* on a high plane and encourage the breeding and ownership of thoroughbred horses in this state." These rules embrace comprehensive regulations designed to safeguard the public and to prevent the evils and corruption which have been too frequently characteristic of horse racing. An analysis of the few of those rules which could possibly have a bearing here reveals that they are not determinative. Rule 158 provides that no jockey shall be weighed out for a race until his fee, in case the race is lost, is deposited or guaranteed and the failure to abide thereby will declare the horse out of the race. The rule could have no effect on the issue here. The labor laws are replete with provisions securing to the laborer assurance that he will receive his pay such as fixed times for pay days, making it a criminal offense to fail to pay laborers, requiring the contractor to pay the prevailing rate of wages in public contracts, and like provisions. Surely, it cannot be

said that such provisions make a laborer an independent contractor. Rule 149 states that any change of jockey shall be exhibited by the Clerk of the Scales upon the notice board. Obviously, that has no significance; indeed, if it has any bearing it may be said it contains the inference that the jockey is wholly subject to the control of the owner of the horse as he may be changed, that is, discharged. Rule 292 reads:

"When an owner or trainer shall discharge a jockey, groom or attendant, he shall, upon demand of the employee give a written statement of discharge setting forth the cause thereof. Upon refusal to do so the owner or trainer may be fined or suspended." There is nothing in that rule inconsistent with the master-servant relationship. Rather it recognizes the right of the owner to discharge his jockey. The only requirement is that he give the jockey, if demanded, a written statement of the reason for the discharge. Similar requirements are not unusual in labor contracts between a union and the employer which require an investigation by the union before a man is discharged. The National Labor Relations Act (29 U. S. C. A. 151, et seq.) has various restrictions on the right of the employer in relation to employment; for illustration he cannot discriminate in regard to the hiring of an employee or the terms of employment by reason of membership in a union.

Rule 279 requires a jockey to register the agent authorized to accept mounts for him and binds him to acceptance of mounts by his agent. He would be bound in any event under ordinary laws of contracts under such circumstances. The rule creates no greater obligation.

Rule 274 provides that the jockey must report to the scale room one hour before the race and must remain there until all his day's racing engagements are fulfilled; no one except jockeys, officials and attendants are permitted in the scale room. It is wholly reasonable to infer that that rule was designed to protect the public and legitimate horse racing from the vice of bribery and "fixed races". There appears no intention to establish or affect the relationship between a jockey and the owner. The essence of petitioner's contention is that by Rule 281, the jockey may not quit or refuse to ride 'a horse once he has engaged to do so, except upon suffering penalties greater than for ordinary breach of contract. That rule provides as follows:

"If a jockey, engaged for a certain race or for a specified time fails or refuses to abide by his agreement, unless excused by the stewards, he shall be fined or suspended; and if a jockey refuses to ride a horse on the order of the stewards he shall be reported to the Racing Board." This rule, insofar as the owner is concerned, does not *prevent* the jockey from quitting. It is the case of a third party, the state, providing a penalty for breach of an employment contract in addition to the damages that could be recovered by the owner. The essential relationship between the jockey and owner is not altered. The owner still has direction and authoritative control over his employee, and the employee still is subject to an action by the owner for damages for quitting the same as he would have been if there were no such rule. ■ It is elementary that a master may recover from his servant any actual damages suffered by reason of his servant's breach of the contract of employment by unjustifiably refusing to perform the services required. (39 Corpus Juris, 133, 134.) We fail to see how the fact that a third person, the state here, through the California Horse Racing Board, may impose penalties in *addition* to the right secured to the master, has any effect or bearing on the question of whether the relationship is that of independent contractor rather than master and servant. It would not be doubted that in many instances a servant would suffer penalties for refusing to perform his contract of employment, in addition to his liability to his master for damages. An airplane pilot regularly employed to operate a passenger plane would certainly be subject to dire penalties if he should decide to quit, don his parachute, jump and abandon the ship full of passengers in midair. Nevertheless, he is unquestionably not an independent contractor.

■ But on a broader basis than the particular effect of each of the rules above considered we do not believe it was the purpose or intention of the legislature in adopting the Horse Racing Act, or the Horse Racing Board in adopting its rules under that act, to make jockeys independent contractors rather than employees, or by that method or any other method, to exempt the jockeys and owners from the workmen's compensation laws. To say such was the intent of the legislature would be fanciful and unreasonable. It would be tantamount to deciding that the legislature by conferring the power to

make rules on the Racing Board thereby authorized the board to amend the workmen's compensation laws, by particularly exempting jockeys from its operation. The act and the rules are designed to regulate horse racing to the end that races may be conducted in an orderly manner and without the evils so often attendant upon contests in which wagering is permitted. It is the aim and purpose to protect the public against immoral practices and to place horse racing on a high plane. It is not to affect an owner and a jockey insofar as their personal contract relations are concerned with the thought of making the jockey an independent contractor regardless of their personal conduct in their negotiations. This finds support in the declaration of policy made by the Racing Board when it established its rules, where it is said:

"They (the rules) have been compiled with the high hope that they will promote racing on a high plane and encourage the breeding and ownership of thoroughbred horses in this state." Even aside from the legislative intent we believe it is clear that statutory or administrative regulations bearing upon the conduct and action of a person furnishing services to another and on the conduct of such other person, do not operate to change the relation between those persons or alter the conclusion that must be drawn from the facts. It is said in the American Law Institute's Restatement of the Law of Agency, volume 1, section 220, page 487:

"The fact that *the State regulates the conduct of an employee* through the operation of statutes requiring specific acts to be done or not to be done *does not prevent the employer from having such control over the employee as to constitute him a servant.*"

In any event the issue of whether or not a person is an employee or an independent contractor is a judicial question and not a legislative or executive one. Legislative and administrative regulations relating to the affairs of persons furnishing services to the persons to whom furnished cannot control the judicial branch of the government in its determination of that question. It is doubtful that even an outright declaration in the rules that a jockey was an independent contractor would be in any way binding upon the courts. The essence of the issue is whether the employer has the right of authoritative control and direction over the employee, by reason of the agreement between them, and not what regulations

some independent authority may for one reason or another impose on the contracting parties.

The award is affirmed.

Shenk, J., Curtis, J., Traynor, J., Edmonds, J., and Gibson, C. J., concurred.