[L. A. No. 19085.  In Bank.  June 19, 1945.]

FIRST INDUSTRIAL LOAN COMPANY OF CALIFORNIA (a Corporation), Respondent, v. EDWIN M. DAUGHERTY, as Commissioner of Corporations, etc., Appellant.

Robert W. Kenny, Attorney General and T. A. Westphal, Jr., Carl W. Wynkoop and J. Albert Hutchinson, Deputies Attorney General, for Appellant.

O'Melveny & Myers, Paul Fussell and Pierce Works for Respondent.

SCHAUER, J.—The question before us concerns the validity of a regulation of the Commissioner of Corporations, effective November 1, 1941 (Industrial Loan Act Rules and Regulations, ch. 5, § 4), which provides that "An industrial loan company shall maintain the statutory surplus required by section 7 of the Industrial Loan Act and shall not use any portion of said statutory surplus to offset bad debts, doubtful accounts or for other special reserve accounts." Upon the validity of such regulation hinges the propriety and effectiveness of an order of the commissioner, here sought to be reviewed, made after a hearing upon an agreed statement of facts. Such order requires plaintiff, a corporation organized under the Industrial Loan Act (Stats. 1917, ch. 522, p. 658; Stats. 1941, ch. 1187, p. 2945; Deering's Gen. Laws, 1937, Act 3603, and supplements thereto) "to restore and maintain the surplus required to be established under section 7 of the Industrial Loan Act and to be maintained under section 4 of chapter 5 of the Rules and Regulations of the Commissioner of Corporations relating to industrial loan companies." Section 7 of the Industrial Loan Act provides that before any dividend is declared and paid to the stockholders of an industrial loan company "not less than 10 per cent of the net profits of such corporation for the preceding half year, or for such period as is covered by the dividend, shall be carried to its surplus until such surplus shall equal the amount of the paid-up capital stock." The rule in question was promulgated by the Commissioner of Corporations pursuant to section 10 of the Industrial Loan Act, which confers upon him the power "to establish such rules and regulations as may be reasonable or necessary *to carry out the purposes and provisions of this act.*" (Italics added.) (See, also, § 11a.)

Following the hearing before the commissioner and the issuance of his order, as related above, plaintiff filed in the superior court its complaint (which includes as an exhibit the agreed statement of facts) by which it sought to have such order declared null and void and of no effect and to have enforcement thereof enjoined. The trial court overruled defendant's demurrer to the complaint and, upon his refusal to plead further, rendered judgment permanently restraining enforcement of the order. We have concluded that the judgment must be affirmed.

According to the allegations of the complaint, which must be taken as true for the purposes of this appeal, plaintiff has, prior to each declaration of a dividend, set aside 10 per cent of its net profits for the dividend period as surplus. However, on various occasions during the four-year period of 1932 through 1935 it used portions of this surplus for the purposes of offsetting bad debts, doubtful accounts, and losses incurred during those difficult years. No net profits were realized and no dividends paid during that period. Such operating losses first exhausted plaintiff's reserves for losses and undivided profits and thereafter caused a reduction of its surplus to an amount lower than the aggregate amount which theretofore had been carried to surplus and which had not at the time of the issuance of the commissioner's order been completely restored. The complaint also alleges the issuance to plaintiff by defendant commissioner, from 1932 through 1941, of permits for the sale of securities despite such use of surplus; the adoption by the commissioner in 1941 of the regulation here in question; and the issuance of the order requiring plaintiff immediately to restore its surplus.

Section 11 of the Industrial Loan Act provides, among other things, that a company against which such an order is issued may commence suit "to restrain enforcement of such order."

Plaintiff, in support of the trial court's judgment restraining enforcement of defendant commissioner's order quoted hereinabove, contends that neither the Industrial Loan Act nor any other statute of this state nor any valid regulation of the commissioner, requires it to maintain unimpaired under all circumstances the surplus which it had accumulated pursuant to the provisions of section 7 of the Industrial Loan Act. Defendant, on the other hand, maintains that his regulation (ch. 5, § 4) and the order issued to plaintiff merely require compliance with section 7 of the act and therefore are within the scope of his rule-making powers under sections 10 and 11a of the act, *supra*. We are of the view that such regulation and order, as they are phrased, impose requirements not intended by the Legislature and that therefore the making of the regulation and of the order based thereon exceed the powers bestowed by the Legislature upon the commissioner.

It should be noted that no question is here presented to us, and we express no opinion, as to whether under the present

statute the commissioner may require that more than 10 per cent of profits be applied to the restoration of an impaired surplus before any dividend is paid. The statute (Industrial Loan Act, § 7) provides for the carrying to surplus of *"not less* than 10 per cent of the net profits'' (italics added) for the dividend period before any dividend is declared. The problem before us does not concern any conditions sought to be imposed as a prerequisite to the payment of dividends; it is limited to the narrow confines of the validity of the absolute prohibition by defendant commissioner against the use by an industrial loan company, under any operating circumstances, of any portion of its minimum accumulated legal surplus to offset bad debts, doubtful accounts, and operating losses. . . .

Each party hereto asserts that section 7 of the Industrial Loan Act is unambiguous but their respective interpretations of it are as divergent as though it were two different statutes. Defendant argues that because of such lack of ambiguity the courts may not vary its provisions and may not read it as omitting the power which he has sought to invoke, while plaintiff insists that for the same reason the section must be construed as written and without implementation by the commissioner.

In considering the issue presented certain general rules are to be recognized. To narrowly proscribe the rule-making power of the commissioner would be to overlook one of the fundamental purposes of the policy of delegation of powers and to deprive the Legislature and the people of the state of one of the major benefits thereof. The essentials of the legislative function are the determination and formulation of the legislative policy. Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the ''power to fill up the details'' by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect, and provision by the Legislature that such rules and regulations shall have the force, effect, and sanction of law does not violate the constitutional inhibition against delegating the legislative function. (*United States* v. *Grimaud* (1911), 220 U.S. 506, 515-518

[31 S.Ct. 480, 55 L.Ed. 563] ; *Red "C" Oil Co. v. Board of Agriculture of North Carolina* (1912), 222 U.S. 380, 394 [32 S.Ct. 152, 56 L.Ed. 240] ; *Opp Cotton Mills* v. *Administrator* (1941), 312 U.S. 126, 144-145 [61 S.Ct. 524, 85 L.Ed. 624] ; *Gaylord* v. *City of Pasadena* (1917), 175 Cal. 433, 437 [166 P. 348] ; *In re Halck* (1932), 215 Cal. 500, 505 [11 P.2d 389] ; *In re Weisberg* (1932), 215 Cal. 624 [12 P.2d 446] ; *Fillmore Union High School Dist.* v. *Cobb* (1935), 5 Cal.2d 26, 32 [53 P.2d 349] ; 1 Cooley's Constitutional Limitations (8th ed.), pp. 228-232.) Accordingly, the regulation in question (Rules and Regulations, ch. 5, § 4), if it falls within the power specially conferred upon the commissioner (by § 10 of the Industrial Loan Act) "to establish such rules and regulations as may be reasonable or necessary to carry out the purposes and provisions of this act," is valid. (*Koshland* v. *Helvering* (1936), 298 U.S. 441, 446-447 [56 S.Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756] ; *cf. California Drive-In Restaurant Assn.* v. *Clark* (1943), 22 Cal.2d 287, 303 [140 P.2d 657, 147 A.L.R. 1028].) ▮ A ministerial officer may not, however, under the guise of a rule or regulation vary or enlarge the terms of a legislative enactment or compel that to be done which lies without the scope of the statute and which cannot be said to be reasonably necessary or appropriate to subserving or promoting the interests and purposes of the statute. (*Boone* v. *Kingsbury* (1928), 206 Cal. 148, 161 [273 P. 797] ; *Whitcomb Hotel, Inc.* v. *California Emp. Com.* (1944), 24 Cal.2d 753, 757 [151 P.2d 233].)

Plaintiff contends that the regulation in question transcends the scope of the statute, while defendant commissioner maintains that such regulation does no more than require compliance with the statute. The difference in the two views is more clearly apprehended in the arguments of counsel to support their respective contentions. Plaintiff argues that there is nothing in the statute expressly forbidding the use of the surplus and claims that the ordinary and usual function of a surplus fund is to absorb losses in time of stress and prevent impairment of capital. Defendant commissioner, on the other hand, takes the position that since there is no language in the statute expressly permitting the use of the surplus, any such use is contrary to law and any used portion must be immediately restored as required by his rule and

order now before us. In ultimate analysis the dispute centers on the proper function of a surplus fund.

A lending institution such as plaintiff, by the nature of its business, is not in danger of incurring large scale liabilities to the public as is an insurance company. Nor is such an institution authorized to issue certificates of deposit or to receive deposits (see Industrial Loan Act, § 4), as is a bank. It is empowered to sell "investment certificates" which must bear the endorsement, "this is not a certificate of deposit." (*Id.*) The uses to which its surplus fund might be put are mainly of two classes: (1) to be constantly preserved as a source of refund, upon dissolution or other appropriate event, to stockholders or investment certificate holders; (2) as an offset for extraordinary losses incurred in the course of business. If employed for the latter use a particularly beneficent purpose may be subserved by the fund in times of stress, by perpetuating the life of the company and its status as a going concern through keeping its capital stock free from impairment and maintaining its solvency.

■ The word "surplus," as applied to financial structures, has a reasonably definite and recognized meaning, as appears from the authorities hereinafter cited. Ordinarily a surplus may be used to absorb at least extraordinary losses. As defined in the standard lexicons and various decisions the word means "That which remains when use or need is satisfied; excess; overplus." (See e. g., Webster's New Int. Dict. (2d ed.) ; *State* v. *State Tax Commission* (1920), 282 Mo. 213, 220 [221 S.W. 721, 722].) ■ A surplus that is used to absorb extraordinary losses serves probably the most important purpose for which it was created. To absolutely forbid its use for such purpose, as is essayed by the regulation in question, tends to destroy in large part its typical usefulness, to impair the solvency of the corporation, or at least its status as a going concern, during periods of abnormal losses, and to impede the normal conduct of its business. Such effects, obviously, do not conduce to the authorized object of regulations; i. e., "to carry out the provisions of this act." If it is the purpose of the commissioner, in effect, to convert the surplus into the full status, so far as impairment is concerned, of capital stock or of an insurance company or bank reserve, it is equally obvious that such a change in the capital struc-

ture of the corporation is beyond the reasonable scope of regulatory power under the present act.

In *Interstate Mtg. Trust Co.* v. *Barnes* (1918), 102 Kan. 334, 338-339 [170 P. 33, 35, L.R.A. 1918C 986] (consolidated with *First National Bank* v. *Moon*), state taxing officials were involved in controversies with banks and a loan company. The court in explaining the framework of banks stated, among other things, that "In order to create a fund to meet unforeseen contingencies and unusual losses, the bank does not distribute all the profits among the stockholders but retains some of them. The fund so created is designated surplus," and then declared that "The foregoing explanation will serve quite as well for . . . loan companies as for . . . banks."

In *Pullen* v. *Corporation Com.* (1910), 152 N.C. 548 [68 S.E. 155, 161], the court observed that "The primary purpose of a bank surplus is the accumulation of a sum against which bad debts may be charged so that at all times the capital may be kept unimpaired."

In *Chicago Title & Trust Co.* v. *Central Trust Co.* (1924), 312 Ill. 396 [144 N.E. 165, 172], in speaking of the "surplus" of a bank the court said, "The item designated as 'surplus' represents permanent surplus or a liability that is carried permanently on the books and is rarely ever decreased or increased except by necessity, in case of a loss to the bank, or in case of an increase by reason of a new declaration of a permanent fund to be carried under that designation."

In *Reynolds* v. *Bank of Mt. Vernon* (1896), 6 App.Div. 62 [39 N.Y.S. 623, 626], cited with approval in *Mulcahy* v. *Hibernia S. & L. Society* (1904), 144 Cal. 219, 224 [77 P. 910], the claim was made that the accumulation of a surplus was illegal. In answer to such contention the court stated, "The propriety of accumulating some surplus is too palpable to require extended discussion. When the capital stock of a bank is impaired, the deficiency must be made good by an assessment on the stockholders; and, in case the deficiency is not made good within 60 days, proceedings may be instituted against it, as in the case of insolvent corporations. Hence, if such a corporation should divide all its profits and accumulate no surplus, any business loss would subject it to the hazard of a receivership and the loss of its corporate life."

The fund sought to be established by the Industrial

Loan Act is not a "reserve fund" such as is required to be maintained by insurance companies (Ins. Code, § 981 et seq.; Stats. 1935, p. 537, as amended), banks (Bank Act, §§ 20, 68; Deering's Gen. Laws, 1937, Act 652), and building and loan associations (Building and Loan Act, § 5.03; Deering's Gen. Laws, 1937, Act 986). The amounts of these respective reserve funds are computed upon the basis of liabilities to the particular class of the public served by the respective institutions. "The accounting use of the word reserve as part of an account title is mostly in a literal sense, to convey the idea of retaining, withholding, setting aside, or setting apart especially for a particular purpose." (MacFarland, Accounting Fundamentals (McGraw-Hill Book Co. (1936), p. 383.) In the case of insurance companies the "reserve" of an insurer must equal the liability of the insurer on its policies. (See Ins. Code, §§ 10870, 980-993, 10530, 11554.) In the case of commercial banks the reserve is proportionate to the deposits. (Bank Act, § 20; Deering's Gen. Laws, 1937, Act 652.) Building and loan associations are required to maintain an "investment certificate reserve" equaling specific percentages of their total investment certificate liability for the protection of those investors who are investment certificate holders. (Building and Loan Act, § 5.03; Deering's Gen. Laws, Act 986.) No such requirement is found in the Industrial Loan Act. Recognizing the distinct character of such a fund is the requirement that banks maintain a "surplus" to be created out of one-tenth part of the net profits calculated at each dividend period until such surplus shall amount to 25 per cent of the paid-up capital stock; the right to use the surplus to offset losses sustained is expressly recognized. (Bank Act, *supra,* § 21.) In the case of building and loan associations (of the stock company type), if a sum is set aside by the corporation for the purpose of declaring dividends on the stock at a rate in excess of that at which they are declared on installment shares, a "stock surplus" must be maintained; into such surplus one-tenth of the amount set aside for such excess dividends on the stock must be placed until the surplus amounts to at least 25 per cent of the par value of the outstanding stock and in the event of impairment of the surplus it is to be restored in the same manner as created. (Building and Loan Act, *supra,* § 10.03.)

, It is noteworthy that impairment of any of the *reserves* mentioned above leads to the immediate imposition of penalties and inhibitions but that no such sanctions are provided in the case of impairment of the surplus to be accumulated under the Industrial Loan Act. Thus, section 20 of the Bank Act, *supra*, provides that if the total reserves of a bank are less than the amount required, the bank shall not increase its liabilities by making new loans or discounts, except by discounting bills of exchange on sight, and shall not pay dividends from profits until the full amount of the total reserve has been restored. In the event of nonrestoration of the total amount of the reserves within thirty days after being ordered by the Superintendent of Banks to make restoration, the bank may be deemed insolvent and proceeded against as provided in the act. If an insurer's ''reserve'' is impaired the insurer is defined as insolvent (Ins. Code, § 981 et seq.) and the Insurance Commissioner is authorized to take possession of its assets, records, etc. (Ins. Code, § 1011(j).)

The Industrial Loan Act, although neither expressly forbidding nor expressly authorizing use of the surplus to meet operating losses, contains language which at least impliedly recognizes that a corporation organized under the act may use or ''impair'' its statutory surplus and still continue to operate. Section 5 provides that ''No corporation under . . . this act shall: (a) Hold at any one time the . . . obligations of any person . . ., as primary debtor, in excess of 5 per cent of the amount of the capital stock of such industrial loan company actually paid in and unimpaired and 5 per cent of its *unimpaired surplus fund.*'' (Italics added.) Section 11 makes express provision that ''whenever . . . the commissioner shall have reason to conclude, that the *capital* of any company hereunder is impaired or reduced below the amount required by law, he may, by an order . . . direct such company to . . . make good the deficiency or impairment of capital alleged by him to exist within 60 days. . . .'' (Italics added.) There is no similar provision in respect to an impairment or reduction of surplus. Since under standard accounting practices the surplus would be exhausted before the capital would be impaired it seems obvious that the act contemplates the possible use of surplus to offset losses and also contemplates continued operation of the company in such event.

It is thus apparent that the Legislature has not used the term "surplus" in the Industrial Loan Act to specify a fund which, as an indispensable requisite to continued business, must remain forever unimpaired; its maintenance is rather a factor of protection for the going concern and it may be reduced by usage to that end when necessity demands. In other words we think that the Legislature by using the word "surplus" evidenced an intent to provide for a surplus rather than for a reserve.

Although not of controlling importance it is also noteworthy that the construction which we place on section 7 of the Industrial Loan Act is in accord with the construction given over a period of years by the federal administrative authorities to section 60 of the National Bank Act, which since 1864 has been worded similarly to the present language of section 7 of the California Industrial Loan Act and which is silent as to use or impairment of surplus. In 1935, section 60 of the National Bank Act was amended to require national banks to augment surplus to an aggregate of 100 per cent of capital instead of 20 per cent (49 Stats. 712), and by revision of our Industrial Loan Act in 1941 the ultimate minimum surplus for loan companies was similarly raised from 25 per cent to 100 per cent of capital. Sections 51 and 60 of the National Bank Act (12 U.S.C.A. §§ 51, 60), as amended in 1935, read as follows:

Section 51. " . . . No such association shall hereafter be authorized to commence the business of banking until it shall have a paid-in surplus equal to 20 per centum of its capital. . . ."

Section 60. "The directors of any association may, semi-annually, declare a dividend of so much of the net profits of the association as they shall judge expedient; but each association shall, before the declaration of a dividend on its shares of common stock, carrying* not less than one-tenth part of its net profits of the preceding half year to its surplus fund until the same shall equal the amount of its common capital. . . ."

The comptroller of the currency has issued the following ruling relative to reduction of surplus of a national bank: "Since the Banking Act of 1935 which requires an ultimate surplus equal to capital, it has been the position of the office that the

* "Probably should read 'carry.'" (Ed., U.S.C.A.).

**556**

surplus cannot be reduced, except to provide for expenses and losses, until it exceeds the amount of the capital. Where the surplus is equal to the capital it must not be reduced below that amount, unless losses have been sustained in amount greater than can be taken care of with existing undivided profits and reserves." (Ruling under Title 12, U.S.C. § 60; U.S.R.S. § 5199, footnote (par. 3670) (1), P.F. 12-6088.)

Had the Legislature intended that the surplus provided for by section 7 of the Industrial Loan Act be maintained without impairment it seems reasonable to assume that it would have expressly so stated. It did make express provision in relation to impairment of capital. ██ It is elementary that the power given to the Commissioner of Corporations (by section 10 of the act) "to establish such rules and regulations as may be reasonable or necessary to carry out the purposes and provisions of this act" does not include power to alter the statute or enlarge or impair its scope. ██ The effect of the rule enunciated in section 4 of chapter 5 of the Industrial Loan Act Rules and Regulations would be to impose requirements not included in the statute and not wholly consistent with the typical financial structure there contemplated. Hence, such rule cannot be sustained. (See *Koshland* v. *Helvering* (1936), *supra,* 298 U.S. 441, 447; *Hodge* v. *McCall* (1921), 185 Cal. 330, 334 [197 P. 86]; *Boone* v. *Kingsbury* (1928), *supra,* 206 Cal. 148, 161-164; *Whitcomb Hotel, Inc.* v. *California Emp. Com.* (1944), *supra,* 24 Cal.2d 753, 759.)

Corollary to the conclusion hereinabove announced—that section 4 of chapter 5 of the Industrial Loan Act Rules and Regulations is invalid—it follows that the commissioner's order, based on such rule, requiring the forthwith restoration and maintenance of the surplus, is also invalid.

For the reasons above stated the judgment is affirmed.

Shenk, J., Edmonds, J., and Carter, J., concurred.

TRAYNOR, J.—I dissent. In my opinion the Commissioner of Corporations was not only empowered to issue the regulation in question but was under a positive duty to do so. The regulation is merely declaratory of sound accounting principles that cannot be disregarded without frustrating the very purpose of section 7 of the Industrial Loan Act to insure the

maintenance of a surplus as a margin of safety over the legal capital. By prohibiting charges against the statutory surplus that should properly be made against income, the regulation guards against the diversion of the surplus into dividends in violation of the act.

The regulation states: ''Provision shall be made by each industrial loan company for the maintaining of current, adequate reserves for unearned interest, unearned discount, losses and doubtful accounts. The balance in such accounts shall be adjusted annually, or if dividends are paid oftener than annually such adjustments shall be made before dividends are declared. An industrial loan company shall maintain the statutory surplus required by section 7 of the Industrial Loan Act and shall not use any portion of said statutory surplus to offset bad debts, doubtful accounts or for other special reserve accounts.''

In the stipulated facts the parties have quoted only the last sentence of this regulation. The validity of any part of the regulation, however, can be determined only by a reading of the regulation in its entirety (see *Weber* v. *County of Santa Barbara*, 15 Cal.2d 82, 86 [98 P.2d 492]) and the court should therefore exercise its authority to take judicial notice of the entire regulation even though only part of it is encompassed by the stipulation. (Code Civ. Proc., § 1875(3); *Drillon* v. *Industrial Acc. Com.*, 17 Cal.2d 346, 352 [110 P.2d 64]; *Parker* v. *James Granger Inc.*, 4 Cal.2d 668, 677 [52 P.2d 226]; *Varcoe* v. *Lee*, 180 Cal. 338, 343 [181 P. 223]; *Stanislaus Lumber Co.* v. *Pike*, 51 Cal.App.2d 54, 56 [124 P.2d 190]; *Arnold* v. *Universal Oil Land Co.*, 45 Cal.App.2d 522, 529 [114 P.2d 408]; *Livermore* v. *Beal*, 18 Cal.App.2d 535, 541 [64 P.2d 987].) The prohibition of the use of the statutory surplus for offsetting bad debts, doubtful accounts or for other special reserve accounts is an inseparable counterpart of the requirement that the companies maintain adequate reserves for losses and doubtful accounts. By maintaining adequate reserves for losses from bad debts the companies charge to income the prospective losses from bad debts and thus decrease the profits available for dividends. The prohibition of the charging of bad debts and doubtful accounts to the statutory surplus insures the charging against income of **that part of the losses from these sources exceeding the re-**

served amount. Thus a company cannot account for its bad debt losses by reducing the statutory surplus account; it must deduct its bad debt losses from current and future gross income and abstain from paying dividends until the bad debt losses in excess of the special bad debt reserve are fully accounted for. If the current income is insufficient for that deduction, the ensuing deficit must be absorbed by future income.

The requirement of special reserve accounts is merely declaratory of what in any event would be a principle of sound management of any credit institution, particularly a credit institution engaged in small loan business. By maintaining reserves for unearned income, such as interest paid in one accounting period but earned in another, the company allocates its receipts to those accounting periods in which they are earned. By maintaining and adjusting in each dividend period reserve accounts for bad debts and similar contingent losses, the company allocates continuously part of its gross income to losses, which are an inherent risk of the business of a credit institution. The establishment and continuous adjustment of a reserve for bad debts precludes the company's carrying loans on its books at a higher value than that which may reasonably be expected to be realized therefrom. (See *Pacific States Sav. & Loan Co.* v. *Hise*, 25 Cal.2d 822, 836 [155 P.2d 809].) By adding to this reserve what sound business judgment demands before paying a dividend, the company allocates to each dividend period its proper share of the losses from bad debts. A company is thus precluded from making it appear that its profits for a given period are higher than the actual profits for that period and that the losses in another period are greater than they actually are for that period. The reserve method of treating bad debts prevents such debts from creating losses at haphazard at times when they must be actually charged off, by requiring deductions from gross income for such losses over the whole period of the company's business operations. The effect of this method is to treat losses from bad debts as they would be treated under accepted accounting practice, namely, as continuous business expenses. (See Patton, Advanced Accounting, p. 18; McKinsey-Noble, Accounting Principles (rev. ed.), p. 237.)

There is a particular need for the accumulation of a reserve

for bad debts in an enterprise where bad debts are significant in amount and frequent in occurrence. (See Mason, Fundamentals of Accounting, p. 171.) Bad debts reserves are therefore customarily maintained in credit institutions, whose principal assets are loans and whose principal business risks are losses from bad debts. (See American Institute of Banking, Fundamentals of Banking, 1943, pp. 449-450.) It is in fact the general practice of industrial loan companies to set up such reserves from earnings as part of their expenses (see Robinson and Nugent, Regulation of the Small Loan Business, pp. 223-224), in recognition of the fact that earnings in the small loan field quickly reflect losses from accounts that prove uncollectible because of changes in the personal circumstances of the borrower. (See Stone and Thomas, *California's Legislature Faces The Small Loan Problem,* 27 Cal.L.Rev. 286, 291.)

If a company could conceal the inadequacy of a bad debt reserve by charging the deficiency to the statutory surplus, it could make its income appear higher than if the deficiency were charged against income, and thus create the illusion that assets in an amount equal to the losses were available for dividends. The offsetting of losses against surplus in this manner would be tantamount to using the surplus account directly for the payment of dividends. The commissioner's regulation precluding the company from making such withdrawals in favor of the shareholders insures the maintenance of the surplus prescribed by section 7. The very terms of that section make it plain that the surplus must be built up and maintained out of the company's income before any dividend is declared: "Before any . . . dividend is declared, not less than ten per cent of the net profits of such corporation for the preceding half-year, or for such period as is covered by the dividend, shall be carried to its surplus until such surplus shall equal the amount of paid-up capital." This surplus is "earned surplus" created out of corporate earnings, as distinguished from "paid-in surplus" representing the excess of the price of issuance over par or stated value, or other capital surplus arising from such sources as the revaluation of assets. If, however, the statutory surplus were available for all purposes for which earned surplus is ordinarily available under the general corporation law of this state, nothing would prevent an industrial loan company from applying the surplus retained at one

dividend period to the payment of dividends in the next period, for section 346 of the Civil Code provides that a corporation may declare a dividend "out of earned surplus." The provisions of section 7 requiring an accumulation of surplus up to the amount of paid-up capital would be of no avail, however, if a company were allowed to undo in one period what it is required to do in the preceding period.

Industrial loan companies, like banks and other credit institutions, use funds that are for the most part furnished by others and that must be returned upon request. Statutory requirements with respect to a surplus, either to be paid up with the capital or to be built up out of profits, are designed to insure the maintenance of a reasonable ratio between the company's own capital and the funds of others. The maintenance of such a ratio insures the security of the enterprise when substantial amounts of credited funds are withdrawn. The Industrial Loan Act includes several provisions in addition to section 7 requiring the retention of a prescribed proportion of the company's own funds in the enterprise. A minimum legal capital is required, ranging from $25,000 to $100,000 depending on the size of the communities in which the company transacts business. (§ 3.) The capital must be paid into the treasury of the company in cash, at least 25 per cent thereof before the articles of incorporation are filed and the balance at the rate of at least 10 per cent per month following the initial payment. (§ 3.) To restrict the employment of credited funds, the act provides that no company may have outstanding more than ten times the amount of its paid-up capital in investment certificates. (§ 5(e).) The commissioner has added the provision that the amount of outstanding investment certificates shall not exceed a limitation fixed by him, if it is lower than the maximum amount allowed in section 5(e) of the act. (Rules and Regulations, ch. 3, § 5.) Like a prescribed cash reserve of a bank, the statutory surplus is designed not as a protection against bad debt losses (*Allen* v. *Luke,* 163 F. 1018, 1019), but as a permanent addition to the capital invested in the enterprise (see *Chicago Title & Trust Co.* v. *Central Trust Co.,* 312 Ill. 396 [144 N.E. 165, 172]), a security to the certificate holders and other creditors and to the public in addition to the required legal capital. Thus the surplus of a bank has been described as "a balance pure and simple belonging to the stockholders of the bank and

remaining in the business in order to give depositors further assurance of the stockholders' confidence in the business. In the banking business it has a real significance beyond that of accounting. It is a supplementary reserve to protect the bank's depositors beyond the capital stock that may be required by law." (Dewing, Financial Policy of Corporations (3d ed.), p. 581.) The purpose of section 7 of the Industrial Loan Act would be frustrated if charges were made against the statutory surplus that should be made against income, to create an appearance that income was available for dividends. The surplus would then in effect be distributed to the shareholders instead of being maintained as the Legislature intended, as additional security to the certificate holders and other creditors of the company.

The majority opinion assumes that the statutory surplus is a fund ostensibly to be used for absorbing losses so that an industrial loan company can meet its obligations without an impairment of its legal capital, which would subject it to the risk of seizure by the commissioner. The statutory surplus, however, is no more a fund than the legal capital, nor does the regulation prevent the use of any assets of the company to meet its obligations. Moreover, far from causing any impairment of the legal capital, the regulation protects that capital from impairment.

The Industrial Loan Act does not require an industrial loan company to maintain the statutory surplus as an earmarked fund of cash or other assets. It merely requires the company to retain a specified percentage of profits in the business until the margin of assets over liabilities equals the amount of the legal capital. "The surplus account represents the net assets of a corporation in excess of all liabilities including legal capital." (*Edwards* v. *Douglas,* 269 U.S. 204, 214 [46 S.Ct. 85, 70 L.Ed. 235]; *Randall* v. *Bailey,* 288 N.Y. 280 [43 N.E.2d 43]; *Landesman-Hirschheimer* v. *Commissioner of Int. Rev.,* 44 F.2d 521, 522; *Porto Rico Coal Co.* v. *Domenech,* 41 F.2d 183, 185; *Winkelman* v. *General Motors Corp.,* 44 F.Supp. 960; see 11 Fletcher, Cyclopedia of The Law of Private Corporations, § 5335.) The statutory surplus therefore cannot be compared with liquid reserves required of a bank, which are actual liquid funds to meet requirements for cash payments when withdrawals of deposits are not bal-

anced by new deposits. (Bank Act, § 20, Deering's Gen. Laws, 1944, Act 652.) The statutory surplus required by the Industrial Loan Act also differs from the surplus equivalent to 25 per cent of a bank's capital required by the Bank Act. (Bank Act, § 21.) The latter must be paid in by the shareholders along with the capital. It can be absorbed by any losses, subject to the limitation that the aggregate paid-up capital plus surplus must equal the percentages of deposit liabilities specified in section 19 of the Bank Act. The shareholders of a bank, if the deposits are not insured by the Federal Deposit Insurance Corporation pursuant to the Federal Reserve Act, are liable for all debts owed by the bank to depositors and other contract creditors. (Stockholders' Liability Act, Deering's Gen. Laws, 1944, Act 652(a).) In the absence of a voluntarily established surplus, the statutory surplus required by an industrial loan company represents to the creditors the only margin of safety over the company's legal capital.

The commissioner's regulation against offsetting bad debt losses against the statutory surplus does not prevent the company from using its assets freely for any legitimate purpose. The company can offset its bad debt losses against profits voluntarily retained in the business, for such earned surplus may be used like current income. If there is not an adequate voluntarily accumulated earned surplus or adequate income against which to charge the losses from bad debts, a deficit should appear on the books and statements of the company to be charged against future income. Such a deficit would show that the statutory surplus was impaired, that the margin of assets over liabilities was less than the aggregate accumulations out of previous profits required as statutory surplus. So long as the deficit does not exceed the amount of the statutory surplus there is no impairment of capital. The statutory surplus thus serves to protect the legal capital from impairment. (See *Mulcahy* v. *Hibernia S. & L. Society*, 144 Cal. 219, 224 [77 P. 910].) The company is not subject to being taken over by the commissioner merely because a deficit indicates that its statutory surplus is impaired. It is not free, however, to charge the deficit against the statutory surplus account and thereby make future earnings available for dividends. The prohibition of the payment of dividends while a deficit exists is the essential legal effect of the commissioner's

regulation. The majority opinion withholds judgment on the question of the commissioner's authority to require the statutory surplus to be fully restored before dividends are paid. In my opinion it is arbitrary to hold the regulation invalid without passing on that question, for the very purpose of the regulation is to insure the payment of dividends out of income and to prevent the depletion of the statutory surplus for such payments.

The majority opinion states that its holding is limited to the validity of the absolute prohibition by the commissioner of the use by an industrial loan company under any operating circumstances, of any portion of the statutory surplus "to offset bad debts, doubtful accounts, and operating losses." There is no prohibition, however, of the offsetting of operating losses generally. The regulation disallows the use of "any portion of said statutory surplus to offset bad debts, doubtful accounts or for other special reserve accounts." The prohibition is therefore limited to losses that should be charged against income by means of adequate reserve accounts. There is no showing that the company has been disallowed offsets against the statutory surplus account of losses that need not be charged against income. The question whether a regulation prohibiting the offsetting of such losses against the statutory surplus would be valid is therefore not involved in this case. Accepted accounting practice differentiates losses chargeable to income from other losses. It is thus not permissible to charge to "paid-in surplus" items that are properly chargeable to income. In the words of the Chief Accountant of the Security and Exchange Commission: "It is my conviction that capital surplus should under no circumstances be used to write off losses which, if currently recognized, would have been chargeable against income. In case a deficit is created, I see no objection to writing off such a deficit against capital surplus, provided appropriate stockholder approval has been obtained." (S.E.C. Accounting Release No. 1, April 1, 1937, 3 C.C.H. Fed. Sec. Laws Service, 61,701, § 72,002; see, also, Am. Inst. of Accountants, Accounting Research Bulletin, No. 3 (1939); Katz, *Accounting Principles in Corporate Distributions,* 89 U. of Pa. L. Rev. 764, 767-768.) It is improper to charge to paid-in surplus an

expense or loss properly chargeable to income in view of the right of the shareholders to have their investment, including the paid-in surplus, maintained. The maintenance of the statutory surplus by an industrial loan company, however, is required in the interest of the certificate holders and other creditors and of the public generally, and is therefore not dependent on the approval of the shareholders.

Since the commissioner's regulation prescribes a rule of sound accounting practice essential to the purposes of the Industrial Loan Act, there can be no valid objection to his order requiring plaintiff to restore the statutory surplus depleted by offsets of bad debts previous to the regulation prohibiting such offsets. Plaintiff was under a duty to provide for its bad debts out of income independently of the commissioner's regulation. By reducing its statutory surplus, it has either paid as dividends income that was not properly available for that purpose or has failed to show a deficit to be charged against future income. The depositors and other creditors of the company are entitled to the restoration of the statutory surplus. The commissioner's order proceeds directly from his power to supervise and control industrial loan companies as to all their corporate powers (§ 4), and to make reasonable regulations to carry out the purposes of the act (§§ 10 and 11(a)). The statutory surplus is so closely related to the public interest and the interest of the certificate holders and other creditors, which the commissioner is charged with safeguarding, that the restoration of that surplus could not be waived by his failure to insist on its restoration on the occasion of applications by the company for the issuance of investment certificates under the Corporate Securities Act'and on the occasion of his examination of the books and records of the company.

Gibson, C. J., concurred.

Appellant's petition for a rehearing was denied July 16, 1945. Gibson, C. J., and Traynor, J., voted for a rehearing.