TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

---

|                                        |     |                |
| -------------------------------------- | --- | -------------- |
| OPINION                                | :   |                |
|                                        | :   | No. 90-936     |
| of                                     | :   |                |
|                                        | :   |                |
| DANIEL E. LUNGREN                      | :   | MAY 7, 1991    |
| Attorney General                       | :   |                |
|                                        | :   |                |
| CLAYTON P. ROCHE                       | :   |                |
| Deputy Attorney General                | :   |                |
|                                        | :   |                |

---

THE HONORABLE HENRY J. VOSS, DIRECTOR OF THE DEPARTMENT OF FOOD AND AGRICULTURE, has requested an opinion on the following question:

Does the Director of Food and Agriculture have the authority to prohibit market milk producers and market milk handlers from contracting for the sale and purchase of bulk market milk at prices which are above the minimum prices established by the Director through stabilization and marketing plans?

CONCLUSION

The Director of Food and Agriculture does not have the authority to prohibit market milk producers and market milk handlers from contracting for the sale and purchase of market milk at prices which are above the minimum prices established by the Director through stabilization and marketing plans.

ANALYSIS

In 1934 the United State Supreme Court found the dairy industry to be one clothed with or affected with a public interest so as to permit regulation of prices by a state. (*Nebbia* v. *New York* (1934) 291 U.S. 502.) In 1935 California enacted its first milk control law by the addition of sections 735-737.12 to the Agricultural Code. (Stats. 1935, ch. 241.)

The original legislation basically provided for the establishment of stabilization and marketing plans for the sale and distribution of fluid milk and fluid cream and the licensing of milk distributors, all under the aegis of the Director of Agriculture. As originally enacted, the marketing plans provided for the establishment of minimum prices to be paid for milk only by distributors to producers. (See original Agr. Code, §§ 736.3.) However, commencing in 1937 and until 1977, the law provided that stabilization and marketing plans should provide for minimum wholesale and retail prices as well. (See Stats. 1937, ch. 413.) However, by Statutes of 1977, chapter 1192, the Legislature amended the law so that the wholesale and retail prices for packaged milk "will be

determined by open competition."  Accordingly, at present the statute does not regulate wholesale or retail price for milk or milk products.

In this opinion request we are asked whether the Director of Food and Agriculture may prohibit milk "handlers" (see Food & Agr. Code, § 61826) from purchasing, and milk "producers" (see Food & Agr. Code, § 61836) from selling bulk or unprocessed "market milk" (See Food & Agr. Code, § 61828) at prices above the minimum prices which are established by the Director through stabilization and marketing plans (Food & Agr. Code, 61838).[1]  Milk handlers allege that they are required to pay "premiums" to producers above the minimum prices set by the Director.  By "premiums" they mean a charge which is allegedly completely unrelated to any costs incurred by milk producers.  In essence, such "premiums" are additional profits charged by milk producers above whatever profit the Director may have already included in the minimum prices he has set for bulk market milk.[2]

The resolution of the question requires an examination of the statutory and case law and the Director's authority to enact administrative regulations.

We conclude from an examination of the law that the Director's powers relate only to the establishment and enforcement of <u>minimum prices</u> and accordingly he has no authority either by statute or through his authority to adopt regulations to prohibit sales at more than the minimum prices he establishes.[3]

---

[1]Section references are to the Food and Agricultural Code unless otherwise specified.

"'Producer' means any person that produces market milk from five or more cows in conformity with the applicable health regulations of the place in which it is sold, and whose bulk market milk is received, acquired, or handled by any handler or any nonprofit association of producers. It includes the nonprofit cooperative associations described in Article 3 (commencing with Section 61871) of this chapter in the transactions in which such article provides that the associations are producers." (§ 61836.)

"'Handler' means any person who, as owner, agent, broker, or intermediary, either directly or indirectly, receives, purchases, or otherwise acquires ownership, possession, or control of market milk in unprocessed or bulk form from a producer, a producer-handler, or another handler for the purpose of manufacture, processing, sale, or other handling, regardless of whether such market milk is produced within or outside this state."  (§ 61826.)

"'Stabilization and marketing plan' means any plan formulated and made effective by the director within the legislative standards provided by this chapter.  It includes, among other things, the establishing of prices to be paid by handlers for any or all of the various classes of market milk."  (§ 61838.)

[2]Milk producers may belong to cooperatives which actually market the milk for them.  (See §§ 61331-61333.)  These "premiums" will then be added to the minimum prices by the cooperatives, which themselves require financing to operate, as part of the negotiated contract price.

[3]Such conclusion assumes that the charging of prices and payment thereof does not violate any of the statutory provisions to be found in the milk marketing laws prohibiting "unlawful trade practices."  (See §§ 61371-61391; 62091-62101.)  For example, price discrimination which may

1. The Statutory Law

As presently constituted, the Food and Agriculture Code in sections 61301 through 62731 presents a comprehensive scheme with respect to the marketing of milk and other dairy products, the formulation of stabilization and marketing plans for "market milk", and the establishment of equalization pools for the distribution of market milk by milk producers.

As examination of all these statutes fails to disclose any provisions which provide that the Director may prohibit the purchase and sale of bulk market milk at more than the minimum prices he sets through the adoption of stabilization and marketing plans. In fact, the statutory law is replete with provisions that the law contemplates only that minimum prices are to be established by him.

Thus, section 61801 et seq. provides for the formulation of stabilization and marketing plans within "marketing areas". Section 61805 sets forth the purposes of this particular legislation, including to:

"(b) Authorize and enable the director to prescribe marketing areas and to determine minimum prices to be paid to producers by handlers for market milk which are necessary due to varying factors of costs of production, health regulations, transportation, and other factors in the marketing areas of this state. . . ." (Emphasis added.)

This is in conformity with the Legislative declaration found in section 61802, subdivision (g) that, due to declines in the supply of manufacturing milk, "it is therefore necessary to conform the present standards governing minimum producer prices for market milk established under this chapter to current economic conditions."

Sections 61991-61998 set forth the procedure for the formulation and adoption of stabilization and marketing plans.[4] Sections 62061 through 62078 then provide for the establishment of minimum prices and for the provisions which a stabilization and marketing plans shall contain. Thus section 62062 provides as to minimum prices:

---

substantially lessen, injure, destroy or prevent competition is prohibited. (§ 61382) Likewise, the Director has promulgated regulations regarding price differences and meeting competition. (See 3 Cal.Code Regs. §§ 1940-1946.)

Where there is an "unlawful trade practice" or other violation of the milk marketing laws, the Director is empowered to take appropriate enforcement action administratively or by court action. (See § 61891 et seq., § 62401 et seq.) This would of necessity be done on a case by case basis.

Also, all stabilization and marketing places must prohibit the statutory "unfair trade practices." (§ 62061.)

[4]It is significant to note that any stabilization and marketing plan must be requested by or "desired by" milk producers who represent not less than 65% of the total number of "market milk" producers in the marketing area who produce not less than 65% of the total "market milk" produced in that area.

Each stabilization and marketing plan shall contain provisions whereby the director establishes <u>minimum prices to be paid by handlers to producers</u> for market milk in the various classes. . . ."  (Emphasis added.)

(See §§ 62062.5, 62063, 62064, 62066, 62069, 62074, 62075, 62078, 62095, 62095.1, 62195, 62311, 62562, 62563, 62623.)  However, no provision in the law appears to prohibit the payment of more than the minimum prices established.  Nor is there any provision in the law which makes it an unfair trade practice in and of itself to charge or pay more than such minimum prices.

We take cognizance of the fact that for minimum pricing purposes market milk is broken down into four classes, depending upon ultimate usage.  The Director, in establishing minimum prices, does so for each class.  (§§ 61931-61936, 62062, 62076-62077.)  We take further cognizance of the fact that virtually all market milk produced in this state is subject to a pooling plan established under the Gonsalves Milk Pooling Act.  (§ 62700 et seq.)  That plan is designed to gradually equalize the monetary returns to market milk producers despite the varying minimum prices that milk may bring as a result of the four usage classifications.  (§§ 62702, 62711, 62712.)

The pooling agreement, however, does not change the basic law with respect to stabilization and marketing plans, already discussed.  The Gonsalves Milk Pooling Act specifically states that that law does not modify the prior chapters of the Food and Agriculture Code regarding the marketing of milk "except as may be necessary to effect the purposes of" that law.  (§ 62724).  Accordingly, the minimum price provisions are applicable to pooling agreements.  (§§ 62712(b), 62724.)  Consequently, any "premiums" agreed upon between the producers and handlers would fall outside of the scope of the pooling laws, which are also minimum price laws.

## 2.  The Case Law and Opinions of this Office

An examination of the case law discloses that the dynamics of California's milk marketing laws since their inception has been aimed at ensuring that consumers are supplied with a constant flow of fresh and wholesome milk at fair and reasonable prices.  To meet this goal the law has provided for <u>minimum</u> prices to be paid to milk producers (and from 1937-1977, to wholesalers and retailers as well) which will ensure to consumers an adequate supply but not an oversupply of milk. (See *Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620, 652-656.  See also *Challenge Cream Etc., Ass.* v. *Parker* (1943) 23 Cal.2d 137, 141-142; *Pac. Coast Dairy* v. *Dept. of Agriculture* (1942) 19 Cal.2d 818, 820-822; *E. M. Consumer Corp.* v. *Christensen* (1975) 47 Cal.App.3d 642, 647; *ShortStop, Inc.* v. *Fiedler* (1971) 17 Cal.App.3d 435, 442.)

None of the cases has considered the question whether the Director has authority to prohibit the sale of milk above minimum prices.  However, in *Knudsen Creamery Co.* v. *Brock* (1951) 37 Cal.2d 485, 490 the court stated:  "The act is aimed primarily at what the producer shall receive, and not what the dealer or consumer shall pay.  (*United Milk Producers* v. *Cecil*, 47 Cal.App.2d 758, 768-769.)"

This office observed in an early formal opinion regarding the milk marketing laws: "The act does not in our opinion intend to protect distributors against the hazards of legitimate competition." (Ops.Cal.Atty.Gen. No. N. S. 2131 (1939).  The following year we concluded that a distributor did not necessarily violate the milk control laws where he sold milk in Stockton for the minimum price and in Tracy for 1/2 cent per bottle above that price.  We stated:

"The prices fixed pursuant to Article 2a, Chapter 10 of the [Agricultural] Code are <u>minimum</u> prices only, and distributor or retailer is at liberty to charge more than the minimum price so fixed.  As you point out, the distributor in question does

not sell milk in the San Joaquin Marketing Area below the price fixed for such area. The fact standing alone that milk is sold at a higher price in one portion of the area than in another portion of such area does not in and of itself constitute a violation of the statute. That practice would be unlawful only if it resulted in a violation of the Unfair Practice provisions contained in section 736.3(a). . . paragraph numbered (3) [the extension to certain customers of special prices or services not extended to all under like terms and conditions]." (Ops.Cal.Atty.Gen. No. N. S. 2666 (1940).)

We further noted that this would constitute a question of fact to be determined by the Department of Agriculture.

The similarity between this 1940 opinion of this office and the question to be resolved herein is striking.

### 3. Contrary Considerations

Suggestions have been made that the Director may prohibit "premiums" charged by producers to handlers based upon certain statutory provisions.

For example, it is argued that "premiums" violate section 62095(b), which provides:

"The payment, gift, or the offer or promise of any payment or gift, of money or other thing of value by any person, directly or indirectly or through any agent or other intermediary, to any handler or producer, or the acceptance by any handler or producer of the payment or gift of thing of value is an unlawful trade practice if it is for any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(b) As a condition upon which a handler will enter into a new contract, or renew, extend, or modify an existing contract, for the purchase of market milk from a producer."

It is argued that a "premium" is a condition upon which a producer will enter into a contract to sell his milk.

This suggestion however, does not take into consideration subdivision (d) of section 62095, which states:

"(d) Nothing in this section prevents a handler from paying to a producer, or a producer from receiving from a handler, prices in excess of the minimum prices established by the director if these prices are paid to all producers supplying the handler under the same terms and conditions."

Accordingly, so long as a handler does not discriminate between producers, he is free to contract to pay any price above the minimum price for milk. In short, we believe that a premium is not a condition upon which a producer will enter into a contract, but is merely part of the negotiated contract price.

Another argument presented is that the charging of a "premium" violates one of the purposes of the law set forth in section 61805, subdivision (b), that "[i]n determining minimum prices to be paid producers by handlers, the director shall endeavor under like conditions to achieve

uniformity of cost to handlers for market milk within any marketing area." It is urged that this same philosophy is emphasized in section 62720 to the effect that "no pooling plan shall result in an unequal raw product cost between distributors in the same marketing areas."

This argument, however, fails to consider that the following sentence of section 61805, subdivision (b) states: "However, no minimum prices established or determined under this chapter shall be invalid because uniformity of cost to handler for market milk in any marketing area is not achieved as a result of the minimum producer prices so established or determined." This argument also fails to acknowledge that these purposes and goals are with respect to minimum prices. These code provisions in no way purport to deal with negotiated prices above the minimum prices established.

In short, we believe that the milk marketing laws relate only to the establishment of minimum prices by the Director. Beyond that point we believe that competitive forces may come into play and that producers are free to negotiate for prices above the minimum prices so long as they do not violate any of the unfair trade practices set forth in the act. (Cf. Ops.Cal.Atty.Gen. No. N. S. 2666 (1940), *supra*.) Otherwise, minimum prices would also constitute maximum prices. In our view, the law does not so provide.

4. The Director's Power To Enact Regulations

Section 61891 provides:

"The director shall enforce the provisions of this chapter and of any stabilization and marketing plan initiated pursuant to the provisions of this chapter. The director shall adopt those regulations necessary for the proper administration and enforcement of the provisions of this chapter."

In *Knudsen Creamery Co.* v. *Brock*, *supra*, 37 Cal.2d 485, 492-493 the Court stated the general rules regarding the adoption of administrative regulations in the context of the milk marketing laws as follows:

"It is the function of the Legislature to declare a policy and fix the primary standard. To promote the purposes of the legislation and carry it into effect, the authorized administrative or ministerial officer may 'fill up the details' by prescribing administrative rules and regulations (*First Industrial Loan Co.* v. *Daugherty*, 26 Cal.2d 545, 549), but as so empowered, he may not 'vary or enlarge the terms or conditions of [the] legislative enactment' (*Boone* v. *Kingsbury*, 206 Cal. 148, 161; also *Whitcomb Hotel, Inc.* v. *California Emp. Com.,* 24 Cal.2d 753, 757, 155 A.L.R. 405) or 'compel that to be done which lies without the scope of the statute.' (*First Industrial Loan Co.* v. *Daugherty*, *supra*, p. 550.). . . ."

In Chapter 3, subchapter 1 of Title 3 of the California Code of Regulations the Director has promulgated regulations relating to "unlawful practices in marketing milk and dairy products." (Cal. Code Regs. § 1800 et seq.) These already include regulations "[t]o assist the director in discouraging the formation of monopolies in the distribution and marketing of milk and dairy products by preventing discriminatory practices designed to force competitors out of business." (Cal. Code Regs. § 1810, subd. (b).)

However, since the milk marketing laws contain no provisions which per se prohibit the charging of or payment of more than minimum prices, the Director has no authority by

regulation to prohibit such practice.  Such would "vary or enlarge the terms or conditions of the legislative enactment."

Accordingly, in sum we conclude that the Director of Food and Agriculture does not have the authority to prohibit market milk producers from contracting for the sale and purchase of bulk market milk at prices which are above the minimum prices established by the Director through stabilization and marketing plans.

* * * *